[No. D057488. Fourth Dist., Div. One. Sept. 26, 2012.]

PV LITTLE ITALY, LLC, Cross-complainant and Appellant, v. METROWORK CONDOMINIUM ASSOCIATION et al., Cross-defendants and Respondents.

COUNSEL

Vantage Law Group and Michael H. Riney for Cross-complainant and Appellant.

Epsten Grinnel & Howell, Joyce J. Kapsal, Rian W. Jones and Lori F. Chotiner for Cross-defendant and Respondent MetroWork Condominium Association.

English & Gloven, Donald A. English, Christy I. Yee and Rebecca A. Kurtz for Cross-defendants and Respondents India Street Venture and Howard Berkson.

**OPINION**

**AARON, J.—**

## I.

### INTRODUCTION

This appeal is from an order of the trial court resolving a dispute between PV Little Italy, LLC (PV Little Italy), and India Street Venture, LLC (India

Street), over their respective rights in a mixed office and retail condominium development in downtown San Diego, known as MetroWork. India Street was the original owner and developer of MetroWork, the centerpiece of which is the retail space that ultimately became the live music and dining venue called "Anthology." For India Street, Anthology was the most important feature of the development, and was the focal point of India Street's efforts in bringing the MetroWork project to fruition. To protect its investment, and in particular, its interest in the retail space, India Street drafted a Declaration of Covenants, Conditions and Restrictions (CC&R's) that grants to the "Declarant" (defined as, initially, India Street) certain rights to control the development and management of the property. Among those rights is a special membership in the MetroWork Condominium Association (Association) that entitles the Declarant to exercise enhanced "Class B" voting rights with respect to any units it owns. Those enhanced voting rights are at the center of the parties' dispute.

To finance MetroWork, India Street obtained a $21.5 million construction loan from KeyBank, N.A. (KeyBank). In connection with that loan, India Street entered into a Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Trust Deed) with KeyBank, pursuant to which it conveyed to KeyBank a security interest in the entire MetroWork project. The Trust Deed explicitly covered not only the real and personal property, but also India Street's rights as Declarant under the CC&R's, including the Class B voting rights.

As construction neared completion, India Street was able to repay a portion of the loan, with the assistance of another loan provided by Pacific Western Bank (Pacific Western). In exchange for India Street's satisfaction of a portion of its debt, KeyBank executed a Substitution of Trustee and Deed of Partial Reconveyance (Reconveyance Deed), releasing to India Street KeyBank's security interest in the retail units of MetroWork, which housed Anthology. By its terms, however, the Reconveyance Deed covered only the retail units themselves and the common areas and personal property associated with those units. Unlike the original Trust Deed, the Reconveyance Deed did not mention the Declarant's rights associated with the retail units.

When India Street defaulted on the balance of the KeyBank loan, the trustee under the Trust Deed conveyed the remaining 16 unsold condominium units in MetroWork to Oreo Corp. (Oreo), an entity related to KeyBank, in a foreclosure sale. KeyBank specifically conveyed to Oreo any and all interest that it had in the Declarant's rights. Oreo subsequently conveyed the remaining condominium units to PV Little Italy. At the same time, Oreo assigned to PV Little Italy all of the Declarant's rights, "if any," that Oreo possessed at that time, "without representation or warranty of any kind as to the existence of same."

After acquiring the property and rights in MetroWork, PV Little Italy informed the Association by letter that it was now the Declarant, and as such, held the right to exercise Class B voting rights. In its letter, PV Little Italy nominated its own slate of candidates for election to the Association's board at the upcoming annual meeting. India Street also claimed to hold Declarant's rights by virtue of the reconveyance from KeyBank, and in particular, maintained that it possessed the Class B voting rights as to the retail units. The Inspectors of Election, LLC (Inspectors), determined that in view of the dispute as to which entity held the Class B voting rights, neither party would be permitted to exercise the enhanced Class B voting rights in the upcoming election. Instead, both would have to vote as regular "Class A" members. In the election, two of PV Little Italy's representatives were elected to the board, and India Street's representative lost his position as president of the board.

India Street sued, in part under Corporations Code section 7616 (section 7616),[1] seeking, among other things, a judicial declaration that it holds Class B voting rights as to the retail units. PV Little Italy intervened and cross-complained, contending that India Street had lost all of its Declarant's rights in the foreclosure, and seeking a declaration that PV Little Italy obtained those rights, including the Class B voting rights, from Oreo. After a section 7616-mandated hearing, the trial court ruled that India Street held Class B voting rights as to the retail units, by virtue of the Reconveyance Deed. The court also determined that PV Little Italy acquired no Declarant's rights upon its purchase of the remaining office units after India Street's default because PV Little Italy had not acquired any rights by direct assignment from India Street, and instead, was an "unaffiliated owner." Based on these findings, the trial court voided the 2010 board election results, and directed that the former board of directors be reinstated and a new election be held. PV Little Italy appealed.

We are required in this appeal to interpret a number of different provisions in several written instruments, and how they interrelate, to determine which rights are held by whom, and in particular, which entity, if any, has the right to exercise Class B voting rights as the Declarant. Hewing closely to basic tenets that govern the interpretation of written instruments, and based on a straightforward reading of the documents before us, we conclude that India Street conveyed a security interest in all of its Declarant's rights, including its Class B voting rights, to KeyBank in the Trust Deed, and that India Street did

---

[1] Further statutory references are to the Corporations Code unless otherwise specified.

Section 7616, subdivision (a) requires that "[u]pon the filing of an action therefor by any director or member or by any person who had the right to vote in the election at issue, the superior court of the proper county shall determine the validity of any election or appointment of any director of any corporation."

*not* obtain release of KeyBank's interest in any of those rights upon the partial reconveyance. Additionally, each of the conveyances after India Street's default included all of the grantor's right, title and interest in MetroWork, including the Declarant's rights, as the CC&R's expressly authorize. PV Little Italy thus simultaneously acquired the status of Declarant as well as any Declarant's rights that were still in existence at the time of the conveyance from Oreo to PV Little Italy, including the Class B voting rights as to the remaining unsold condominium units. PV Little Italy therefore was not an "unaffiliated owner" within the meaning of the CC&R's.

Accordingly, we reverse the trial court's order in its entirety.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The MetroWork CC&R's and India Street's rights thereunder*

MetroWork is a commercial common interest condominium development located in downtown San Diego. India Street purchased the property on which MetroWork was built in 1998, and was the original developer of that property. Berkson Realty, LLC (Berkson Realty), is the managing member of India Street, and Howard Berkson (Berkson) is the managing member of Berkson Realty. The nine-story MetroWork building consists of retail and office condominiums. The first and second floors currently house Anthology—a dining and live music venue (the Retail Units).[2]

For India Street, the Anthology space represented the "crown jewel" of this development. To protect its planned substantial investment in the Retail Units, and to address the interrelationship between the Retail Units and the office units in the project, India Street drafted the CC&R's in 2005 for the Association, a nonprofit corporation formed pursuant to California's Nonprofit Mutual Benefit Corporation Law. (§ 7110 et seq.) The Association adopted an amended and restated version of the CC&R's in 2007.

Under the CC&R's, the "Declarant" has a special status. The CC&R's define "Declarant" in full, as follows: " 'Declarant' shall initially mean India Street Venture, LLC . . . , its successors, and any person to which it shall have assigned its rights hereunder, in whole or in part, by an express written assignment." As the Declarant, India Street retained ownership of the Retail

---

[2] We use the term "Retail Units" to readily distinguish the Anthology units from the office condominium units in the project, and to be consistent with the trial court's usage of that term. In doing so, we do not attach any particular legal significance to that terminology.

Units. It also initially reserved ownership of units on the ninth floor for uses related to Anthology's operations. In its capacity as Declarant, India Street was granted certain rights to control the development and management of MetroWork, until such time as all of the units in the project were sold. For example, India Street had the right to appoint and remove members of the Development Committee, which oversaw the plans, specifications and construction progress of MetroWork, until such time as all of the units were sold. (CC&R's, §4.01.) It also reserved for itself certain rights of easement and entry which passed upon the last close of escrow for the sale of a unit from Declarant. (CC&R's, § 6.01.) Finally, it possessed the right to develop the property only for as "long as any Condominium in the Project remains unsold." (CC&R's, § 7.01.) India Street acknowledged in the trial court that pursuant to the scheme created by the CC&R's, once all of the units in the building were sold, the Declarant's rights and privileges in the property would cease to exist, at least as to all units not owned by the Declarant (and it was anticipated that India Street or a related entity would continue to own the Retail Units).

Section 1.28 of the CC&R's defines an "[o]wner" of a unit as: "[T]he record Owner, whether one or more persons or entities, of a fee simple interest in a Condominium, including Declarant with respect to each Condominium owned by Declarant, and including sellers under executory contracts of sale, but excluding those persons holding title as security for the performance of an obligation." Every unit owner automatically becomes a member of the Association, and remains a member until its ownership ceases. Additionally, the CC&R's specify that "[a]ll memberships shall be appurtenant to the Condominium conveyed." "There shall be no severance by sale, conveyance, encumbrance or hypothecation of an interest in any Unit from the concomitant membership in the Association," as long as the CC&R's remain in effect.

The CC&R's divide membership in the Association into different classes, the first two of which are relevant to this appeal. Class A members include "all Owners," each of whom "shall be entitled to one (1) vote for each 1,000 Square Feet of floor area in such Owner's Unit, rounded to the nearest thousand." Most significantly for present purposes, the CC&R's provide for a special Association membership with enhanced voting rights for the Declarant. Specifically, the CC&R's state: "The Class B member shall be Declarant," who is entitled to "ten (10) votes for each 1,000 Square Feet of floor area in any Units owned by Declarant." The Declarant's Class B membership would terminate "upon the date the Declarant no longer owns any Units in the Property." Additionally, the CC&R's provided that "[u]pon the sale of a Unit owned by Declarant to an unaffiliated third party, the Class B membership for that Unit shall be converted to a Class A Membership."

B. *The KeyBank loan and India Street's default*

Construction began on the MetroWork site in 2005. During the early phases of the project, Berkson negotiated with KeyBank to provide a construction loan to fund the project. India Street provided KeyBank a copy of the CC&R's and the Association's bylaws. The parties finalized the loan in January 2006. KeyBank promptly recorded the Trust Deed, as well as a "UCC Financing Statement" detailing the personal property that was part of the collateral for the loan. As security for the $21.5 million loan, India Street made the following conveyance, in pertinent part, to KeyBank as beneficiary under the Trust Deed:

"1.1 <u>Grant</u>. For the purpose of securing payment and performance of the Secured Obligations defined [in the deed of trust], [India Street] hereby irrevocably and unconditionally grants, bargains, sells, conveys, mortgages and warrants to Trustee, in trust for the benefit of Beneficiary, with power of sale and with right of entry and possession, all estate, right, title and interest which Trustor now has or may later acquire in and to the following property (all or any part of such property, or any interest in all or any part of it, as the context may require, the 'Property'):

"(a) The real property . . . (the 'Premises'); together with

"(b) All buildings, structures and improvements now located or later to be constructed on the Premises (the 'Improvements'); together with . . . [¶] . . . [¶]

"(g) All of Trustor's rights, title, interest and privileges whatsoever, as 'Developer'; 'Declarant'; 'Subdivider' or similar position or title pursuant to any 'condominium declaration,' 'declaration of covenants, conditions and restrictions,' or similar document recorded in the Official Records of the County in which the Premises is located . . . ."

The construction loan set forth the circumstances under which India Street could obtain a partial reconveyance "releasing from the lien of the Deed of Trust the applicable Condominium Units," defined elsewhere in the loan as a "commercial condominium unit or units and all common areas associated therewith." The loan specified as follows: "Releases of Condominium Units shall not affect or impair the lien of [Trust Deed] and Lender's lien and security interests created by the other Loan Documents as to Condominium Units and other property encumbered by the [Trust Deed] and the other Loan Documents not previously released, and said liens and security interests shall continue in full force and effect as to the unreleased Condominium Units and other such property."

Construction of the MetroWork project was completed by June 15, 2007, when the notice of completion was recorded. The CC&R's were recorded on July 3, 2007. India Street had closed escrow on approximately half of the office condominium units by the end of 2008. As the development neared completion, India Street began to take steps to obtain release of the Retail Units from KeyBank's security interest. To that end, India Street negotiated the "Third Modification Agreement" with KeyBank, dated September 1, 2007, which extended the maturity date of the loan upon satisfaction of several conditions, including various payments for the release of the Retail Units, and India Street's securing a Small Business Administration (SBA) loan in connection with the release of those units from the lien of the Trust Deed. India Street successfully obtained that SBA loan from Pacific Western. To perfect its new security interest in the Retail Units, Pacific Western recorded two deeds of trust and a UCC Financing Statement in October 2007, none of which explicitly mentions the Declarant's rights, but all of which purport to cover, effectively, all of India Street's "right, title and interest" in the Retail Units, including its "development rights."[3]

India Street successfully obtained release of the Retail Units from KeyBank's security interest in December 2007, and the Reconveyance Deed was recorded in February 2008. That document substituted KeyBank as the trustee under the Trust Deed, and reconveyed "WITHOUT WARRANTY TO THE PERSONS LEGALLY ENTITLED THERETO A PORTION OF the estate" held by KeyBank, namely, "Units U-100 and U-200" (the Retail Units), together with the common area use rights associated with those units. There is no mention of Declarant's rights or voting rights in that document. An amended UCC Financing Statement was also recorded at that time, and it, too, contained no mention of the Declarant's rights.

As of January 2008, India Street had defaulted on the balance of its loan from KeyBank. Negotiations for a forbearance agreement were unsuccessful, and KeyBank ultimately directed the trustee to foreclose on the Trust Deed as to the remaining unsold units in the MetroWork project. At the foreclosure sale in March 2009, the trustee conveyed to Oreo, an affiliate of KeyBank, "all of its right, title and interest in and to" the 16 remaining office units and related common areas, "[t]ogether with all of the property set forth on" the attached exhibit C, which included a description of the Declarant's rights. Oreo conveyed the foreclosed units to PV Little Italy on November 9, 2009. On that same day, Oreo recorded an assignment and assumption of Declarant's rights (the PVLI Assignment Agreement), by which Oreo conveyed to PV Little Italy, and the latter assumed, Oreo's "right, title, and interest, if any, as the Declarant under the [CC&R's] and all other documents, agreements and materials creating or governing the [MetroWork project], effective

---

[3] No explanation is given for why two deeds of trust were recorded for this transaction.

from and after the date hereof, but without representation or warranty of any kind as to the existence of same." The grant deed to PV Little Italy and the PVLI Assignment Agreement were both recorded on November 13, 2009.[4]

## C.  *The voting rights dispute and ensuing litigation*

At the annual Association meeting scheduled for July 7, 2009, the Association's board of directors agreed to postpone the election of directors to January 2010, in order to coordinate with the Association's budgeting activities. By letter dated November 23, 2009, PV Little Italy informed the Association that it had obtained the Declarant's rights under the CC&R's for the MetroWork project, and that India Street's interest in those rights had been extinguished by the foreclosure sale. PV Little Italy announced its intention to seek the removal of the entire existing board of directors for the Association and to nominate a new slate of directors at the January meeting. On January 27, 2010, the Association informed its members that Inspectors had been retained to conduct the recall election and that there was "currently a dispute between two (2) owners . . . as to who is the Declarant of the [Association] project and therefore [sic] Class B voting rights." The Association also notified members that Inspectors had determined that this dispute would have to be settled by arbitration or in the courts, and that to fulfill its statutory obligations, it would conduct the recall election on March 1, 2010, with "all members being considered as Class A members with the voting power" attendant to that class. The March election, at which neither PV Little Italy nor India Street was permitted to exercise the Class B voting rights, resulted in the election of two of PV Little Italy's representatives, and the removal of Berkson as president of the Association's board. Berkson remained a director.

India Street filed its initial complaint in February 2010, and unsuccessfully sought a temporary restraining order to block the March recall election. On April 8, 2010, it filed its verified first amended complaint alleging five causes of action and requesting various forms of relief, including, under section 7616, a determination that India Street retained the Declarant's voting rights under the CC&R's. PV Little Italy intervened and promptly filed a cross-complaint, in which it also sought relief under section 7616.

---

[4] The PVLI Assignment Agreement recites that Oreo first entered into a purchase agreement for the foreclosed units with PacVentures, Inc., the managing member of PV Little Italy, which in turn assigned that agreement to PV Little Italy. PV Little Italy denies that this was a two-step sale, and the grant deed to PV Little Italy suggests that whatever transactions may have taken place were intended to be part of a single conveyance from Oreo to PV Little Italy. Since India Street did not raise a legal issue in the trial court based on whether this conveyance occurred in one or two transactions, and does not do so on appeal, we accept on this record PV Little Italy's representation that it simultaneously acquired both the foreclosed units and assignment of the Declarant's rights directly from Oreo.

The trial court held the statutory section 7616 hearing on May 7, 2010. (See § 7616, subd. (c).) On May 18, 2010, the court issued a minute order in which it concluded that India Street "retained its 'Declarant' class B voting rights, and conversely cross-complainant [(PV Little Italy)] never obtained such rights." With respect to the Retail Units, the essence of the trial court's ruling was that the Class B voting rights were an inherent component of ownership of those units. The trial court concluded that despite the fact that the Reconveyance Deed did not mention the Class B voting rights, those rights were "within the penumbra of assets that were conveyed back to" India Street once KeyBank's security interest in those units was terminated. The court thus concluded that Oreo obtained no such rights upon the foreclosure, and therefore, could have conveyed no such rights to PV Little Italy. Specifically, with respect to the office units on which India Street had defaulted, the trial court found that Oreo had obtained those units through a nonjudicial foreclosure sale and had subsequently sold them to PV Little Italy. The court concluded that because "PV Little Italy did not acquire its ownership rights via direct assignment" from India Street, pursuant to the CC&R's, PV Little Italy was an "unaffiliated owner" with no Class B voting rights. (See CC&R's, § 1.15, 2.05, subd. (b).) Consistent with this ruling, the trial court invalidated the March 1, 2010 election, ordered that a new election be held within 60 days, and reinstated the officers and board that existed prior to the March 1, 2010 election.

## III.

## DISCUSSION

### A. *The trial court's order is appealable as an injunction*

We first consider whether the trial court's May 18, 2010 order—which on its face is not a "judgment" and did not purport to resolve all issues between the parties—is appealable. At our direction, the parties submitted supplemental briefing on this issue. We conclude that the order is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6), in that it granted injunctive relief.

■ "A trial court's order is appealable when it is made so by statute." (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 [107 Cal.Rptr.2d 149, 23 P.3d 43] (*Griset*).) The "one final judgment" rule, codified in Code of Civil Procedure section 904.1, subdivision (a)(6) allows appeals in a civil case to be taken not only from a "judgment," but also from various types of orders, including orders granting or refusing to grant an injunction. Whether a particular order constitutes an appealable injunction depends not on its title or the form of the order, but on " 'the substance and

effect of the adjudication.' " (*In re The Clergy Cases I* (2010) 188 Cal.App.4th 1224, 1234 [116 Cal.Rptr.3d 360] (*Clergy Cases I*).) An injunction is defined as "a writ or order requiring a person to refrain from a particular act." (Code Civ. Proc., § 525.) Injunctions also may command a person to perform a particular act. (*Luckett v. Panos* (2008) 161 Cal.App.4th 77, 84 [73 Cal.Rptr.3d 745] (*Luckett*).)

In its May 18, 2010 order, after finding that India Street retained the Class B voting rights and that PV Little Italy had never acquired those rights, the trial court ruled that the March 2010 election was void, and entered the following order: "[A] new election must be forthcoming within 60 days of the date of this order. The officers and board for the MetroWork Condominium Association that existed immediately prior to the March 1, 2010 election will immediately retake interim control of the Association pending the new election." The plain language of this order constitutes a mandatory injunction, since it required the immediate turnover of control of the Association to the prior board and officers, and the holding of a new election. India Street disingenuously argues that the order is not appealable as an injunction because it "does not *expressly* grant an injunction." (Italics added.) As noted, however, it is not the form, but the substance of an order that determines its appealability.[5]

■ Another key indicator of whether an order is final and appealable is that " 'no issues in the action remain for further consideration . . . .' " (*Clergy Cases I, supra*, 188 Cal.App.4th at p. 1234; see *Canandaigua Wine Co., Inc. v. County of Madera* (2009) 177 Cal.App.4th 298, 303 [99 Cal.Rptr.3d 264] ["[A]n order constitutes a final judgment despite other causes of action remaining if the order effectively disposes of the entire case. For example, an order is appealable if it resolves an allegation that is essential to all of the causes of action."].) The May 18, 2010 order resolved the core conflict between the parties by determining on the merits which party possesses the Declarant's rights, and in particular, the Class B voting rights. India Street's complaint sought declaratory and injunctive relief, specific performance, and reformation of the CC&R's. The gist of the action was India Street's effort to have itself declared the party that held the right to exercise the Class B voting rights attached to the Retail Units. PV Little Italy intervened for the express

---

[5] India Street also asserts that the order is not appealable as an injunction because it was merely a "determination as to the rights of parties to exercise Class B voting rights" and did not "prohibit or mandate action by any party." Plainly, that is not the case. The order required the prior board members to reassume control and directed the Association to hold a new election. India Street further suggests that the order is not an injunction because it did not "prohibit or mandate action *on the part of* [*PV Little Italy*]." However, the law defines injunctions as orders requiring "a person" to do or not to do something. (Code Civ. Proc., § 525; *Luckett, supra*, 161 Cal.App.4th at p. 84.) There is no requirement that the "person" whom the order directs to act be a particular party.

purpose of resolving whether it, and not India Street, is the Declarant and holds Class B voting rights. PV Little Italy therefore sought a judicial determination of the voting rights of the parties and the related issues of the validity of the March 2010 board election. Like India Street, PV Little Italy requested relief under section 7616 to resolve these issues.

The order appealed from accomplished that goal, and neither party has indicated that anything more of substance remains to be done in the litigation, except entry of judgment. Indeed, as India Street acknowledges, it has since voluntarily dismissed its causes of action pertaining to issues other than those raised pursuant to section 7616. (See *Griset, supra*, 25 Cal.4th at p. 698 [a decree generally may be considered final "where no issue is left for future consideration"]; see also *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 667 [140 Cal.Rptr.3d 647] [holding that appellate jurisdiction exists even where claims have been dismissed without prejudice to enable entry of judgment, unless the parties also have stipulated to facilitating future litigation of the dismissed claims].)

For the foregoing reasons, the trial court's May 18, 2010 order is appealable. We turn now to the merits of PV Little Italy's appeal.[6]

### B. *Applicable standard of review*

This appeal presents two issues. First, did the Reconveyance Deed release KeyBank's security interest not only in the Retail Units themselves, but also in all of the Declarant's rights, including the Class B voting rights as to Retail Units? Second, did PV Little Italy become the Declarant upon its purchase of the 16 units from Oreo, and thus gain Class B voting rights as to those units? The trial court's determination of these questions turned primarily on the court's review and interpretation of various written documents—in particular, the CC&R's, the Trust Deed, and the Reconveyance Deed.

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact . . . is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], citation omitted (*Parsons*).) An appellate court reviews such instruments independently, "unless the interpretation turns upon the credibility of extrinsic evidence." (*Ibid.*; see *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817 [76 Cal.Rptr.3d 41] (*Harvey*) ["Where, as

---

[6] Although the Association was a party defendant in the proceedings in the trial court, it expressly took no position as to whether India Street or PV Little Italy possesses the Declarant's rights.

here, the trial court's interpretation of the CC&R's does not turn on the credibility of extrinsic evidence, we independently interpret the meaning of the written instrument."].)

Although India Street submitted some extrinsic evidence to aid in the trial court's interpretation of the relevant documents, the trial court did not rest its ruling on any of the extrinsic evidence. Moreover, while PV Little Italy attempted to impeach the credibility of India Street's witnesses, it offered no directly conflicting extrinsic evidence of the parties' intent or of their understanding of the documents under consideration. Instead, PV Little Italy argued that the documents speak for themselves. Because the trial court did not rely on extrinsic evidence, and because the extrinsic evidence that the parties presented was not in conflict, in this appeal "we must make an independent determination of the meaning of" the written instruments before us. (*Parsons, supra,* 62 Cal.2d at p. 866; see *Home Federal Savings & Loan Assn. v. Ramos* (1991) 229 Cal.App.3d 1609, 1613 [284 Cal.Rptr. 1] ["Here, because the parties presented little relevant and no conflicting extrinsic evidence [citation], the trial court properly refused to submit the interpretation of the written guaranty to the jury. [Citation.] Likewise, however, we as the reviewing court consider the evidence and interpret the guaranty de novo."].)

C. *The trial court erred in finding that India Street, as owner of the Retail Units, retained the Declarant's Class B voting rights*

    1. *The plain language of the CC&R's, the Trust Deed, and the Reconveyance Deed, all indicate that the Class B voting rights associated with the Retail Units were not reconveyed to India Street.*

■ In determining whether the Reconveyance Deed released KeyBank's security interest in India Street's Declarant's rights and the Class B voting membership, we are guided by familiar rules that govern the interpretation of written instruments. "The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract." (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1385 [137 Cal.Rptr.3d 293] (*Klein*).) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639; see *Klein, supra,* at p. 1385; see also *Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447 [99 Cal.Rptr.3d 20] (*Starlight Ridge*).) ■ " 'We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation.' " (*Starlight Ridge, supra,* at p. 447.) When the language of the instrument is unambiguous, we

determine the parties' intent solely by reference to that language. (*Ibid.*; *Klein, supra,* 202 Cal.App.4th at p. 1385; see Civ. Code, § 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"].)

We begin our analysis with the CC&R's, the key document that defines the scope of the Declarant's rights, the nature of Class B Association membership, the ability of the Declarant to transfer its rights, and the consequences of doing so. At the time the CC&R's were created, India Street was the original Declarant, and as such, initially possessed Class B voting rights as to the entire MetroWork project. (See CC&R's, § 1.15, stating "Declarant shall initially mean [India Street]." ) In addition to the Class B voting rights, as Declarant, India Street also possessed a number of rights under the CC&R's that enabled it to control management of the project during development, and to protect its investment in Anthology, including the enhanced Class B voting rights. (See CC&R's, §§ 2.05, 4.01, 7.01–7.04, 8.02.) Importantly, India Street had the power to assign its rights under the CC&R's to another person or entity. CC&R's section 1.15 reads, in full: " 'Declarant' shall initially mean [India Street], its successors, and any person *to which it shall have assigned its rights hereunder, in whole or in part, by an express written assignment.*" (Italics added; see CC&R's, § 7.03 [providing that Declarant's rights "may be assigned by Declarant to any successor in interest to any portion of Declarant's interest in any portion of the property by a recorded written assignment"].)

There is no dispute that, pursuant to CC&R's section 1.15, India Street assigned its Declarant's rights, including the Class B voting rights, in their entirety, to KeyBank, as security for a construction loan to finance the MetroWork project. The Trust Deed of which KeyBank is the beneficiary provided that, as security for the loan, India Street, as trustor, "hereby irrevocably and unconditionally grants, bargains, sells, conveys, mortgages and warrants to Trustee, in trust for the benefit of [KeyBank], with power of sale and with right of entry and possession, all estate, right, title and interest which [India Street] now has or may later acquire" to the MetroWork property. (Trust Deed, § 1.1.) That grant explicitly included "[a]ll of Trustor's rights, title, interest and privileges whatsoever, as 'Developer', *'Declarant'*, 'Subdivider' or similar position or title pursuant to any 'condominium declaration,' 'declaration of covenants, conditions and restrictions,' or similar document recorded in the Official Records of the County in which the Premises is located . . . ." (Trust Deed, § 1.1, subd. (g), italics added.)

The parties agree that the effect of this conveyance was to lodge with the trustee, for the benefit of KeyBank, legal title to the property transferred, but that the transfer did not alter India Street's ability to develop and manage the

MetroWork project, or to exercise its Declarant's rights (including Class B voting rights as to any units it owned), as long as there was no default. (See 4 Witkin, Summary of Cal. Law (10th ed. 2005) Security Transactions in Real Property, § 5, p. 795 [with a deed of trust that includes the power of sale, "title passes to the trustee, who holds it until default; then, after sale, it goes from the trustee to the purchaser"]; see also *id.*, § 6, p. 796 [deed of trust "actually gives the trustee only the interest that is necessary to carry out the trust," taking "legal title for security only, leaving a legal estate and the ordinary rights of ownership in the trustor"].) Thus, up to the time of its default, India Street was able to exercise all of its Declarant's rights, including voting rights.[7]

In 2008, India Street successfully obtained release of the Retail Units from the lien of the Trust Deed. However, unlike the original deed of trust, the Reconveyance Deed *made no reference to the Declarant's rights.* India Street contends that the language of the Reconveyance Deed "completely released KeyBank's security interest in the 'owner's entire estate' consisting of the Retail Units." However, that is not what the document says. Rather, the Reconveyance Deed reconveyed only "*A PORTION OF* the estate now held by it under the Deed of Trust as specifically described on Exhibit 'A' attached hereto." (Original capitalization, italics added.) Exhibit A describes only the Retail Units themselves, plus the associated common areas. There is no mention of the Declarant's rights. In its brief, India Street concedes, albeit implicitly, that there is no *express* release of the Declarant's rights in the Reconveyance Deed. In depositions, Berkson could recall no specific discussion about voting rights with KeyBank during negotiations over the reconveyance, and Lorne Polger (Polger), the attorney who negotiated the terms of the reconveyance on behalf of India Street, acknowledged that there had been no such discussions.

Our conclusion that there was no reconveyance of the Declarant's rights is further buttressed by the language of the original construction loan from KeyBank, which specifically provides that a partial reconveyance "shall not affect or impair the lien of the Deed of Trust and Lender's Lien and security interests created by the other Loan Documents as to the Condominium Units and other property encumbered by the [Trust Deed] and the other Loan

---

[7] For this reason, India Street's assertion that KeyBank never objected to any exercise by India Street of the Declarant's rights is not relevant to determining whether those rights were reconveyed. Prior to the foreclosure sale, KeyBank had no basis for objecting to India Street's exercise of those rights in the normal course of its role as Declarant, as long as doing so did not impair KeyBank's security interest. (See, e.g., Trust Deed, §§ 2.6, 5.6) Although India Street also claims that KeyBank raised no objection to India Street's exercise of Class B voting rights or Declarant's rights *after* the foreclosure sale, there is no evidence that India Street actually exercised those rights after April 10, 2009, the date on which the trustee's deed upon sale was recorded.

Documents not previously released, and said liens and security interests shall continue in full force and effect as to the unreleased Condominium Units and other such property."[8] Additionally, the trustee's deed that was recorded after the foreclosure sale evidences that the trustee conveyed to Oreo not only the remaining real and personal property of MetroWork, but also, *explicitly*, the Declarant's rights. It is thus clear that KeyBank knew how to reconvey the Declarant's rights to India Street, if that had been what the parties intended. However, no language of reconveyance or release of the Declarant's rights, insofar as applicable to the Retail Units, appears in the Reconveyance Deed or in any other document filed in connection therewith.

The trial court acknowledged that the Reconveyance Deed contained no language releasing the Declarant's rights, but nonetheless held that the reconveyance included the Declarant's rights. In reaching this conclusion, the court observed that the rights (including the Class B voting rights) granted to the Declarant in the CC&R's were designed to ensure that India Street, as original owner and operator of the project, could exercise "control over building management," particularly with respect to the Retail Units. The court reasoned that "it is counter-intuitive to presume that these Declarant's rights [(including the voting rights)] could be separated from the ownership interest in the retail units." Accordingly, the court held that although the Reconveyance Deed "did not expressly list Declarant rights, they are within the penumbra of assets that were conveyed back to [India Street]." We disagree, and conclude that the trial court's interpretation of the Reconveyance Deed is not supported by the express terms of that document, nor by any of the documents that were executed in connection with the KeyBank loan.

The trial court's fundamental error lay in its misapprehension of the relationship between the Declarant's Class B voting rights and ownership of the Retail Units. We agree with PV Little Italy that while membership in the Association, in general, is "appurtenant" to ownership of any unit in MetroWork, the Declarant's enhanced voting rights do not automatically attach to ownership of the Retail Units, nor to any other unit, nor are they inseparable therefrom.

It is true, as India Street contends, that ownership of a unit automatically carries with it membership in the Association, for as long as the unit is owned. Section 2.03 of the CC&R's states as much, and further provides that "All memberships shall be appurtenant to the Condominium conveyed . . . ."

---

[8] India Street's assertion that KeyBank did not expressly "reserve" any security interest in the Declarant's rights upon reconveyance is, therefore, beside the point. It is undisputed that all of those rights were conveyed to KeyBank in the Trust Deed. Under the terms of the KeyBank loan, any part of that security interest that is not released is retained by KeyBank. No "reservation" of rights was necessary.

The CC&R's also specify, in section 13.01, that "[t]here shall be no severance by sale, conveyance, encumbrance or hypothecation of an interest in any Unit from the concomitant membership in the Association." However, these provisions merely illustrate that membership in the Association is solely a function of unit ownership. (See CC&R's, § 2.03 ["Ownership of a Condominium shall be the sole qualification for membership in the Association."].)

By contrast, Class B membership is not determined solely by being an owner, but rather, by being a *particular* owner—i.e., the Declarant. (CC&R's, §§ 1.15, 2.05, subd. (b), 7.03.) In other words, the unique status and rights of the Declarant do not result from ownership of a condominium, but rather, from specific grants in the CC&R's to the Declarant. (See, e.g., CC&R's, art. VII, §§ 7.01, 7.02, 8.02, subd. (b).) The "Declarant" is defined in the CC&R's not in terms of ownership of a unit, but rather, as "initially" being India Street, its successors, and assignees. (CC&R's, § 1.15.) Importantly, the Declarant is not necessarily India Street, because the CC&R's permit the Declarant to assign its rights to another, "in whole *or in part*," to any number of assignees. (CC&R's, § 1.15, italics added; see § 7.03 ["The rights of Declarant hereunder and elsewhere in these Restrictions may be assigned by Declarant *to any successor in interest to any portion of Declarant's interest in any portion of the property* by a recorded written assignment." (italics added)].)

Contrary to India Street's contentions and the trial court's conclusions, nothing in the CC&R's binds the Retail Units irrevocably to the Declarant (whether Declarant is India Street or some other entity) or to the Declarant's Class B voting rights. Those units are not defined as "units owned by the Declarant" or "units owned by India Street." Rather, the "Retail Parcel" is defined in the CC&R's only as "Those units on floors 1–2 as set forth on the Condominium Plan." Even the so-called "Declarant Units" are not defined as "units owned by the Declarant," or as "units owned by India Street," but rather, merely as "those units comprising floors 1, 2 and 9 as described in the Condominium Plan."[9] (CC&R's, § 1.16.) India Street identifies no language in the CC&R's stating that the first and second floors of MetroWork must always be owned by an entity deemed to be the Declarant. Absent such language, nothing in the CC&R's prevents ownership of the Retail Units from being separated from the status of Declarant and its concomitant voting rights. Indeed, the very provision that grants the enhanced voting rights as to any unit owned by the Declarant anticipates the possibility that those rights

---

[9] The CC&R's make clear that no particular meaning or significance may be separately attributed to the mere use of the word "Declarant" in the term "Declarant Units." (See CC&R's, § 14.03 ["The Article and Section headings, titles and captions have been inserted for convenience only, and shall not be considered or referred to in resolving questions of interpretation or construction."].)

could be terminated upon sale of the unit to an unaffiliated entity. In that case, the special Class B membership is converted to the standard Class A membership.[10] (CC&R's, § 2.05.)

For these reasons, the plain language of the CC&R's belies the trial court's conclusion that the Class B voting rights cannot be separated from the Retail Units. The combined effect of CC&R's sections 2.03, 2.05, subd. (b), and 13.01, summarized above, is that Class B voting rights may not be separated from any units owned by the *Declarant*—but that merely begs the question: which entity is the Declarant? When India Street assigned a security interest in its Declarant's rights to KeyBank, and did not obtain a release of those rights as to the Retail Units in the reconveyance, upon India Street's default, the status of Declarant, and the concomitant enhanced voting rights, became separated from ownership of the Retail Units. By operation of the CC&R's, India Street was no longer the Declarant; it had become just like any other owner, with Class A membership in the Retail Units.

Despite acknowledging that the Declarant's rights had not been expressly reconveyed to India Street, the trial court reasoned that it was "counter-intuitive to presume that these Declarant's rights could be separated from the ownership interest in the [Retail Units]," since the CC&R's had been drafted with the intention of allowing India Street to maintain control over management of those units. The court concluded that those rights therefore must have been "within the penumbra" of assets reconveyed to India Street. We do not disagree with the trial court's interpretation of what India Street subjectively intended in drafting the provisions in the CC&R's pertaining to the Declarant's rights. The record appears to substantiate India Street's assertions that its focus, from the beginning, was to make Anthology the "crown jewel"

---

[10] We have found only two uses of the term "Declarant Units" in the CC&R's. Both provide, in pertinent part, that "the Declarant" and/or its successors and assigns may utilize the Declarant Units for any use permitted by law, including retail, restaurant and club uses. (CC&R's, §§ 7.02, 8.02, subd. (b).) It may well be that India Street drafted these provisions *intending to preserve for itself the right to use, as Declarant, the Retail Units for Anthology or a similar use in perpetuity*, but that is not what these provisions say. Rather, these provisions protect the right of the *"the Declarant"*—whichever entity that might be—to use the Declarant Units in this manner.

India Street presented no evidence that KeyBank shared India Street's understanding that Declarant rights always had to attach to the Retail Units, or that ownership of those units was to be reserved solely for India Street and solely *in its capacity as Declarant*. India Street asserts that KeyBank "agreed that ownership of the Retail Parcel for Anthology's operations would be reserved *solely* for India Street or its related entities" (italics added), but points to no language in the CC&R's, the construction loan, or in the Trust Deed that would substantiate that statement. Even if it is true, nothing in that "agreement" indicates that KeyBank made any representations about the future of the Declarant's rights, and in any event, the current status of ownership of the Retail Units is consistent with India Street's assertion: India Street (or an affiliate) owns the Retail Units and is using them for Anthology. However, it does not own them as the Declarant.

of MetroWork. India Street undoubtedly envisioned that only it, or a related entity or direct assignee, would be the owner of the Retail Units as Declarant. India Street structured the CC&R's in a manner that would preserve India Street's ability to use the Retail Units for Anthology or a similar purpose well into the future. Thus, although many of the Declarant's powers would terminate once MetroWork was fully developed and all other units of MetroWork were sold, the Declarant's right to use the Retail Units for a restaurant or nightclub venue was protected in perpetuity, and all other owners purchased their units subject to those uses, *for as long as the Declarant owned the space.* (Compare CC&R's, § 7.01 [protecting the right of Declarant to develop MetroWork as it "deems advisable" for "so long as any Condominium in the Project remains unsold"], with § 7.02 [allowing Declarant to use the "Declarant Units" for any use allowed by law, including restaurant and club uses].) Further, pursuant to CC&R's section 2.05 the enhanced Class B membership survives for as long as Declarant owns a unit.

That said, we are bound to interpret written instruments according to the parties' intent *as manifested in the written instrument,* if that language is clear and explicit. (See, e.g., *Parsons, supra,* 62 Cal.2d at p. 866; *Starlight Ridge, supra,* 177 Cal.App.4th at p. 447.) While it may have seemed "counter-intuitive" to the trial court that KeyBank would release its security interest in the Retail Units without also releasing the Declarant's rights associated with those units, India Street drafted the CC&R's and negotiated the loan agreement and various deeds in a manner that did not foreclose that possibility. It is not for the trial court, or this court, to inject our own "intuition" into the analysis of the parties' intent when the language of the instruments is clear. (See, e.g., *Klein, supra,* 202 Cal.App.4th at p. 1385 [the contracting parties' intent is interpreted according to objective, rather than subjective, criteria].)

Our conclusion that the Reconveyance Deed did not release KeyBank's security interest in the Declarant's rights as to the Retail Units is based on the express and unambiguous language of the Reconveyance Deed itself, the CC&R's, and other instruments. (*Harvey, supra,* 162 Cal.App.4th at p. 817 ["The language of the CC&R's governs if it is clear and explicit . . . . The parties' intent is to be ascertained from the writing alone if possible."].) Notwithstanding the manifest intention of the CC&R's to protect India Street's investment in the Retail Units, the CC&R's also expressly permit the Declarant to assign all or a portion of its rights. This right of assignment, together with the original Trust Deed's express conveyance of a security interest in the Declarant's rights to KeyBank, and the lack of any language releasing that interest in the Reconveyance Deed, all indicate, under the usual rules of interpretation, an intent to exclude the Declarant's rights from the reconveyance. (Cf. *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881–882, fn. 4 [221 Cal.Rptr. 509, 710 P.2d 309] [the familiar maxim,

*expressio unius est exclusio alterius* (the inclusion of one thing implies exclusion of others), applies to contract interpretation].)

■ If the plain language of the instrument is unambiguous, a court may not "read into" the document additional terms in order to conform its meaning to what the court's "intuition" tells it the parties must have intended. Rather, the court "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ." (Code Civ. Proc., § 1858; see *Klein, supra*, 202 Cal.App.4th at pp. 1385–1386.) There are, of course, instances when the parties mutually intend one thing, but due to mistake or inadvertence, the written document does not reflect that intent. In that instance, the law permits the court to reform the document consistent with the parties' intent. (See, e.g., 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 276 [discussing reformation remedy generally], 279, pp. 306, 309 [noting that a deed may be reformed]; Civ. Code, § 3399 [permitting "revision" of contract that "does not truly express the intention of the parties"].) Although India Street initially included in its complaint a claim for reformation, it voluntarily dismissed that claim after the section 7616 hearing, and it makes no argument on appeal that the absence of an express release of the Declarant's rights in the Reconveyance Deed was due to mistake or inadvertence.

2. *The other documents and extrinsic evidence on which India Street relies are insufficient to demonstrate that KeyBank released the Declarant's rights as to the Retail Units by means of the Reconveyance Deed.*

■ In determining the meaning of a written instrument, we are permitted to consider not only its language, but also " 'the circumstances under which [it] was made and the matter to which it relates.' " (*Starlight Ridge, supra*, 177 Cal.App.4th at p. 447, citations omitted.) India Street urges us to look at the broader context in which the reconveyance was accomplished, and to consider other evidence indicating that the intention underlying that conveyance was to restore to India Street not only the Retail Units themselves, but all of the Declarant's rights associated with those units. In our view, however, these other documents and the extrinsic evidence of intent that India Street proffers are unhelpful and fail to demonstrate any intent other than that revealed by the plain language of the CC&R's and the Reconveyance Deed.

For example, India Street contends that the third modification to the original loan agreement, combined with other documents executed in anticipation of the reconveyance, released all of KeyBank's interests in the lien on the Retail Units. By definition, this language covered only "Condominium Units 1A and 2A" themselves, and nothing else. India Street points to no language in the Third Modification Agreement that would indicate otherwise.

As an additional condition of the release of the Retail Units, India Street agreed to execute a second deed of trust that encumbered only the Retail Units, but that was otherwise identical to the original Trust Deed. This second deed was additional consideration for the Third Modification Agreement, was intended to "be subordinate only to the lien of the deed or deeds of trust securing repayment of the [Pacific Western SBA] loan," and was to be returned to India Street upon the fulfillment of certain conditions, absent any default. In the trial court, India Street maintained that this second deed, which was never recorded, "would have been unnecessary" if the release of the Retail Units was not intended to be a complete release of all of KeyBank's interest.

The purpose of this second deed is unclear, and in any event, India Street has not explained how the deed demonstrates that the KeyBank reconveyance released the Declarant's rights. Nothing on the face of the second deed supports India Street's argument. On the contrary, the second deed serves merely to reinforce that KeyBank held a security interest in the Declarant's rights associated with the Retail Units. In our view, the absence of specific language in the Reconveyance Deed releasing that interest, notwithstanding the language of the second deed, only reaffirms that there was no release of the Declarant's rights as to the Retail Units by KeyBank in the Reconveyance Deed.

India Street emphasized in the trial court, and does so again on appeal, the fact that before obtaining the reconveyance, it obtained a second loan on the Retail Units from Pacific Western, and in exchange for that loan, gave Pacific Western a security interest in those Units and in "any and all . . . rights . . . relating to . . . the development or occupancy" of the Retail Units. This presumably demonstrates, in India Street's view, that it was India Street's intention to regain the Declarant's rights as to the Retail Units, unencumbered by any KeyBank interest, so that it could convey a new security interest in those rights to Pacific Western.

There are several flaws in this argument. First, regardless of what India Street may have intended in terms of a reconveyance of Declarant's rights, as we have explained, the language of the reconveyance does not manifest that intention. Second, the Pacific Western deed makes no explicit reference to "Declarant's rights," which are dealt with separately in the CC&R's, and which, in the original Trust Deed, were listed separately from other "Developer" rights that India Street may have possessed. As such, the Pacific Western deed does not demonstrate that India Street conveyed to that lender any security interest in the Declarant's rights.

Third, even if the conveyance to Pacific Western of "all of [India Street's] right, title, and interest in . . . all other rights . . . relating to the real

property," including "development rights," could be construed broadly to include the Declarant's rights, such a conveyance would not necessarily be inconsistent with KeyBank retaining its own security interest in the Declarant's rights, since two deeds of trust may cover the same property. (See *Davidow v. Corporation of America* (1936) 16 Cal.App.2d 6 [60 P.2d 132] [upholding validity of foreclosure sale on second deed of trust on property already covered by first deed of trust]; 4 Witkin, Summary of Cal. Law, *supra*, Security Transactions in Real Property, § 6, pp. 796–797 [noting that, because a deed of trust conveys only an interest sufficient to carry out the trust, and does not vest the trustee with the entire estate in the property, it is possible to have a second deed of trust covering the same property].) India Street can have conveyed to Pacific Western only whatever title it had, subject to the rights of KeyBank, which claimed an interest under the first deed of trust. (*Davidow, supra*, at p. 12.) Additionally, Pacific Western recorded its deeds of trust on October 31, 2007, *before* KeyBank had recorded or even executed the reconveyance (on Feb. 19, 2008, and Dec. 10, 2007, respectively). Pacific Western thus presumably took its security interest subject to KeyBank's interest, which was prior in time. (See, e.g., Trust Deed, § 1.2, subd. (b) [providing that all persons acquiring an interest in the property "will be considered to have notice of, and will be bound by, the . . . Secured Obligations" created by the KeyBank loan and related documents].)[11]

India Street also references a "Subordination Agreement" pursuant to which KeyBank subordinated the lien of the Trust Deed to the CC&R's. However, India Street fails to explain the relevance or significance of the Subordination Agreement to the issues before us. To the extent that India Street is suggesting that this agreement essentially "nullified" the conveyance of a security interest in the Declarant's voting rights under the Trust Deed, we reject that assertion as without foundation and entirely contrary to the explicit intent to convey such an interest to KeyBank by means of that deed. To the extent that India Street is suggesting only that this language required KeyBank to allow India Street to continue to exercise rights as the Declarant, including enhanced voting rights, notwithstanding the security interest created by the Trust Deed, the subordination language adds nothing to our analysis. As noted previously, a deed of trust does not prevent the trustor—in this case, India Street—from continuing to exercise all of the ordinary rights of ownership.[12] (See discussion, *ante*, at pt. III.C.1.)

---

[11] Because the issue is not before us, we express no opinion on the nature of any security interest that Pacific Western may have obtained in the Declarant rights, or what may have happened to that interest once India Street defaulted on the KeyBank loan and the latter foreclosed on its remaining security interests.

[12] India Street also points to similar subordination language in the Pacific Western deeds of trust. But the effect of such language would have been no different than the effect of the

Contrary to the trial court's conclusion, in our view, none of the UCC Financing Statements included in the record supports the trial court's conclusion that the reconveyance necessarily included the Class B voting rights. PV Little Italy contends that any mention of the Declarant's rights in these statements is surplusage, because UCC Financing Statements pertain only to personal property, and the provisions of the CC&R's are deemed to create equitable servitudes, which are real property rights and obligations. (See Civ. Code, § 1354; CC&R's, preamble, ¶ D.) Moreover, PV Little Italy argues, UCC Financing Statements do not, in themselves, convey security interests. Rather, they provide notice of the collateral covered by a security agreement. (Compare Cal. U. Com. Code, § 9102, subd. (a)(73) [defining "security agreement" as "an agreement that creates or provides for a security interest"] with Cal. U. Com. Code, § 9310, subd. (a) ["a Financing Statement must be filed to perfect all security interests . . ."].) India Street does not respond to these arguments.

In any event, the UCC Financing Statements are consistent with the plain language of the Trust Deed and the Reconveyance Deed, as we have interpreted that language. Like the Trust Deed, the original UCC Financing Statement covered all buildings, goods, rents and materials located on the MetroWork property, but also separately and explicitly mentioned "All of Debtor's rights, title, interest and privileges, whatsoever, as 'Developer,' 'Declarant,' " or other position pursuant to the CC&R's. The amendment to that financing statement recorded at the time of the reconveyance, like the Reconveyance Deed itself, notably does *not* include that same language in the release of collateral. Rather, it states only: "That portion of the real property described on Attachment 1 hereto [(a description of the Retail Units)] is hereby deleted from the definitions of 'Improvements,' 'Premises' and 'Condominium Units' set forth in the initial Financing Statement and Secured Party's interest therein is released." The Declarant's rights were not included either within the legal description included as attachment 1, or within the defined terms listed in the amendment. Finally, as previously noted, upon the foreclosure sale, the trustee conveyed to Oreo all of its remaining "right, title and interest" in unsold units of MetroWork, as set forth not only in the legal description of the physical property attached to the trustee's deed of sale, but also as set forth in the initial UCC Financing Statement annexed to that deed, which explicitly mentioned the Declarant's rights, and which was attached as an exhibit to the trustee's deed upon sale. This evidences in plain language that the trustee still held a security interest in the Declarant's rights at the time of foreclosure, and that it intended to include those rights in the conveyance to Oreo after the foreclosure.

Subordination Agreement with KeyBank. Until such time as India Street defaulted on the KeyBank loan, India Street was free to exercise its Declarant rights in the MetroWork project, as explained above, without interference by either KeyBank or Pacific Western.

India Street's reliance on Civil Code section 1358 is misplaced. That statute provides that any "conveyance . . . of the owner's entire estate also includes the owner's membership interest in the association." (*Id.*, subd. (b).) We agree with PV Little Italy that because India Street did not raise this argument in the trial court, it may not properly raise it for the first time on appeal. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 8.229, p. 8-155 (rev. # 1, 2011), and cases cited therein.) In any event, the argument is unavailing. As we have explained, the CC&R's were not written in a way that makes Declarant's enhanced voting rights appurtenant to ownership of the Retail Units. Whether a transferee of a unit obtains Class B membership of the Declarant, or instead, the same Class A membership as any other owner receives, depends solely on whether that transferee is the "Declarant." When KeyBank released its security interest in the Retail Units without simultaneously releasing its interest in the Declarant's rights, and India Street subsequently defaulted, India Street lost the status of Declarant and thus could no longer exercise Class B voting rights as to those units—although it could exercise Class A membership. The directive of Civil Code section 1358 is therefore observed: India Street's ownership of the Retail Units includes membership rights in the Association, albeit not the membership that India Street had perhaps planned to possess.

■ Because the language of the relevant instruments is clear and unambiguous, resort to extrinsic evidence of the parties' intent is unnecessary and even inappropriate. (*Parsons, supra,* 62 Cal.2d at p. 865; see Civ. Code, § 1639; Code Civ. Proc., § 1856, subd. (b).) The trial court thus erred in looking to the Berkson and Polger declarations to bolster its conclusion that India Street possessed Class B voting rights as a function of its ownership of the Retail Units. However, even if the Reconveyance Deed were susceptible of more than one interpretation (and we do not believe that it is), reliance on these declarations as evidence of the parties' intent would be improper. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554] (*Winet*) [court may consider extrinsic evidence of the parties' intent, as long as that evidence is "relevant to prove a meaning to which the language is 'reasonably susceptible.' [Citation.]"].) The Berkson and Polger declarations merely confirm what the language of the CC&R's already makes clear—namely, that India Street wanted to protect its "crown jewel" investment in the Retail Units. Moreover, Berkson avers only that it was his "understanding" that the release of the Retail Parcel from the lien of the deed of trust was to be a full release, and states that he would not have entered into the reconveyance "if KeyBank had expressed an intention to reserve any rights related to the Retail Parcel." Similarly, Polger states that he "understood" that between the Reconveyance Deed and the amended UCC Financing Statement, all real and personal property collateral in the Retail Units would be released, including

any Declarant's voting rights "to the extent that such voting rights were attached to the realty" or "were deemed a personal property interest."

Such subjective statements of "understanding" are irrelevant, however, particularly where there is no evidence that KeyBank had the same understanding. As PV Little Italy notes, the deposition testimony of both Berkson and Polger indicates that they never discussed the Declarant's rights with KeyBank in connection with the reconveyance. (See, e.g., *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579–580 [53 Cal.Rptr.3d 887, 150 P.3d 764] [the "uncommunicated subjective intent" of one party cannot be used to contradict the objective manifestation of the parties' intent]; *Winet, supra,* 4 Cal.App.4th at p. 1166, fn. 3 [evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language].)[13]

■ While it is fundamental that the court should avoid interpreting a writing in a manner that results in an absurdity (see Civ. Code, § 1638 [language of instrument controls if it "does not involve an absurdity"; see also *Starlight Ridge, supra,* 177 Cal.App.4th at p. 447), India Street makes no argument that any interpretation other than the trial court's would be "absurd," and our interpretation does not lead to an absurd result. The CC&R's were evidently drafted with the intention of giving India Street a great deal of flexibility to exercise or assign its Declarant's rights as it saw fit, and as its business needs required, even if that meant conveying the status of Declarant to another entity. It is not unreasonable to presume, as PV Little Italy contends, that KeyBank would want to retain its security interest in the Declarant's rights while the substantial balance of its loan to India Street remained outstanding, so that in the event of a default, it would have the greatest possible degree of control over the project's management pending the sale of the remaining units. Polger, India Street's attorney, acknowledged as much during his deposition.

For the foregoing reasons, we conclude that the Reconveyance Deed did not release KeyBank's lien on the Declarant's rights, including the enhanced voting rights associated with the Retail Units.

---

[13] Polger stated in his declaration that he and KeyBank's representatives discussed the release and "reallocation" of KeyBank's "collateral," but he does not state that the release of voting rights was discussed, and in fact, in his deposition testimony, he acknowledged that there was no such specific discussion. He further testified that he "[did not] believe that the bank reconveyed its collateral interest in the declarant rights by virtue of the reconveyance of the deed of trust."

D. *Oreo expressly conveyed to PV Little Italy any remaining Declarant's rights that it may have possessed at the time of the sale; accordingly, PV Little Italy holds Declarant's rights, including Class B voting rights, as to any units that it still owns*

After India Street's default, KeyBank foreclosed on the remaining 16 unsold units in the MetroWork project, and these units were promptly sold to Oreo at the trustee's sale. The trustee's deed upon sale conveyed all the real and personal property covered by the Trust Deed (with the exception of the Retail Units already reconveyed), and specifically identified the Declarant's rights as among the property conveyed to Oreo. On November 13, 2009, Oreo sold these units to PV Little Italy. On that same day, Oreo entered into an assignment and assumption agreement pursuant to which it transferred to PV Little Italy its "right, title, and interest, if any, as the Declarant" under the CC&R's, specifying that the transfer was "without representation or warranty of any kind as to the existence of same." We now address whether, by virtue of this assignment, PV Little Italy became the Declarant and obtained the Declarant's Class B voting rights as to the units that it purchased from Oreo. Relying once again primarily on the plain language of each of the conveyances after India Street's default, we conclude that PV Little Italy did acquire those rights. Accordingly, we reverse the trial court's ruling to the contrary.

The terms of the Trust Deed granted to KeyBank the power, upon India Street's default, to enter and take possession of the property covered by the Trust Deed, to "manage and operate all or any part of the Property," and "do any and all other things in connection with those actions that Beneficiary may in its sole discretion consider necessary and appropriate to protect the security of" the Trust Deed. (Trust Deed, § 6.3 subd. (c).) As PV Little Italy contends, the express inclusion of the Declarant's rights in the conveyance in the Trust Deed demonstrates an intention that, upon any default by India Street, KeyBank would be able to step into India's Street's shoes as Declarant and exercise the Declarant's rights to manage and protect the development, thereby maximizing its recovery on the loan at any future sale. India Street does not dispute this. Upon India Street's default, and by virtue of the express conveyance in the Trust Deed, title to all the tangible and intangible property covered by the Trust Deed (excluding the Retail Units but including all Declarant's rights) vested with the trustee, for the benefit of KeyBank. (See CC&R's, § 1.15; Trust Deed, § 1.1, subd. (g).)[14]

---

[14] To be clear, *legal* title vested not with KeyBank per se, but with the trustee, for the benefit of KeyBank. In a deed of trust, title passes to the trustee "at the time the instrument is originally executed." (4 Witkin, Summary of Cal. Law, *supra*, Security Transactions in Real Property, § 169, p. 969.) Thus, the only entity with the power to convey title to a purchaser at a foreclosure sale is the trustee. (1 Bernhardt et al., Cal. Mortgages, Deeds of Trust, and Foreclosure Litigation (Cont.Ed.Bar 4th ed. 2012) § 2.98, p. 133 (rev. 1/12).) Because

We next consider whether the trustee had the authority under the CC&R's to convey the Declarant's rights to Oreo, and if so, whether Oreo effectively passed those rights on to PV Little Italy. The trial court first found that, by virtue of KeyBank having reconveyed the Declarant's rights to India Street, Oreo had "no such rights to convey" to PV Little Italy after the foreclosure sale. The trial court did not expressly limit this finding only to those Declarant's rights associated with the Retail Units, but rather, appears to have concluded that Oreo acquired "no such rights"—even those associated with the units as to which India Street had defaulted. However, as we have explained, the Reconveyance Deed did not transfer back to India Street any of the Declarant's rights. Thus, even under the trial court's reasoning, at a minimum, the Declarant's rights as to the unsold units remained "in play" at the time of the foreclosure sale.[15]

In its briefing in the trial court, India Street acknowledged that upon the foreclosure sale, Oreo acquired those rights because it is affiliated with KeyBank. According to India Street, it was only upon the subsequent sale to PV Little Italy—an "unaffiliated third party"—that the Class B voting rights associated with the foreclosed condominium units were terminated and converted to Class A rights, pursuant to section 2.05, subdivision (b) of the CC&R's. At the section 7616 hearing, however, India Street shifted its position, arguing that because it was the trustee that held title to all of the property, and there had been no conveyance to KeyBank, the foreclosure sale to Oreo was itself a sale to an "unaffiliated third party," and thus, Oreo acquired no Declarant's rights. The trial court adopted the "unaffiliated third party" approach in evaluating the nature of PV Little Italy's rights, and concluded that because PV Little Italy "did not acquire its ownership rights via direct assignment from [India Street] and was instead an unaffiliated owner," PV Little Italy acquired no Declarant's rights. Not surprisingly, on appeal, India Street agrees with the trial court, arguing both that Oreo "did not acquire" India Street's Class B membership and voting rights upon the foreclosure sale and thus had no rights to convey to PV Little Italy, and also that PV Little Italy, an entity neither affiliated with, nor a direct assignee of, India Street, could not have acquired Class B voting rights as a result of its purchase from Oreo.

KeyBank was not substituted as the trustee after the default, as it was for purposes of the reconveyance, and because it did not receive a deed in lieu of foreclosure (*id.*, § 7.2, pp. 516–517 (rev. 1/12)), it remained only the beneficiary under the Trust Deed, with the power to direct the trustee to sell the property. (See Trust Deed, § 6.3, subd. (g).)

[15] The CC&R's, by their terms, contemplate that there could be more than one Declarant at any given time. Specifically, the CC&R's permit assignment of the Declarant's rights "in whole *or in part*." (CC&R's, §1.15, italics added; see § 7.03 [allowing the Declarant to assign its rights "to any successor in interest to any portion of Declarant's interest in any portion of the property"].) PV Little Italy does not contend that it gained any Declarant rights as to the Retail Units.

The analytical flaw in the trial court's and India Street's reasoning is that it improperly conflates section 1.15 of the CC&R's with section 2.05, subdivision (b). Section 1.15 defines the term "Declarant." The reference to PV Little Italy as an "unaffiliated owner" presumably stems from section 2.05, subdivision (b) of the CC&R's, which provides for the conversion of Class B voting rights to Class A rights upon the sale of a unit owned by Declarant to an "unaffiliated third party." In order to determine whether the Declarant's rights—including the Class B voting rights—in the foreclosed units were effectively transferred to Oreo, and in turn to PV Little Italy, we must first determine, under section 1.15 of the CC&R's, who may become the Declarant, and specifically, whether a Declarant other than India Street may effectively assign the status of Declarant and the Declarant's rights to another person or entity. The answer to that question determines whether CC&R's section 2.05's treatment of the Class B voting rights comes into play at all.

CC&R's section 1.15 provides that " 'Declarant' shall *initially* mean [India Street] . . . *its* successors, and any person to which *it* shall have assigned *its* rights hereunder, in whole or in part, by an express written assignment." (Italics added.) This sentence arguably may be interpreted in two different ways. Consistent with the narrow interpretation adopted by the trial court and urged by India Street, the definition may be construed to mean the following: " 'Declarant' shall initially mean India Street, and thereafter only its direct successors or assigns." This approach construes the word "initially" as applying only to India Street. However, there is another reasonable interpretation pursuant to which "initially" modifies the entire remainder of the sentence, such that the definition would have the following meaning: " 'Declarant' shall *initially* mean India Street, its successors and assigns, but thereafter, 'Declarant' could be other entities as yet unnamed." This interpretation contemplates a potentially unlimited universe of Declarants in the future, who could exercise the Declarant's rights as set forth in the CC&R's for as long as MetroWork remained in its developmental stages, and— specifically with respect to the enhanced voting rights—for as long as the person or entity that has the status of Declarant owns units in the property.

To resolve the arguable ambiguity in this phrase, we consider not just the language of this provision, but the larger context in which it appears, as well as the apparent purposes underlying the designation of "Declarant." (*Starlight Ridge, supra*, 177 Cal.App.4th at p. 447 [" 'We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation. [Citation.]' "]; Civ. Code, § 1647 [permitting court to consider circumstances under which contract was made and the matter to which it relates].) We also may consider any extrinsic evidence bearing on the interpretation of this provision, but there is virtually none relevant to this specific issue. (*Winet, supra*, 4 Cal.App.4th at p. 1165.)

We conclude that the language and structure of CC&R's section 1.15 supports the second interpretation, not the more restrictive one that the trial court adopted. First, if the intent of the CC&R's was to restrict the status of "Declarant" only to India Street or its *direct* assignees, then the inclusion of the word "initially" would have been superfluous; "Declarant" could simply have been defined as "India Street, its successors and its assignees." The term "initially" is a specific modifier that was presumably included for a reason. (See, e.g., Civ. Code, § 1641 [contract should be read as whole "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"]; *Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1063–1064 [119 Cal.Rptr.3d 17] (*Advanced Network*) [" 'We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage.' [Citation.]"].) As written, nothing in the definition limits the application of "initially" only to "India Street." If the latter was intended, one reasonably might have expected the definition to state, ". . . initially India Street, *and thereafter*, its successors, and any person to which it shall have assigned its rights."

Second, another provision in the CC&R's clarifies that the status of Declarant may be conveyed to entities other than a *direct* assignee of India Street. CC&R's section 7.03 provides that "[t]he rights of Declarant hereunder and elsewhere in these Restrictions may be assigned by Declarant to *any* successor in interest to any portion of Declarant's interest in any portion of the property by a recorded written assignment." (Italics added.) This language, although somewhat dense and cumbersome, specifies that the "Declarant" (and not solely India Street) may assign the Declarant's rights to *any* successor in interest. In our view, this provision, read together with CC&R's, section 1.15, shows that the status of Declarant could be held by direct assignees of India Street, *or* by assignees of an assignee of India Street. As long as the assignor is itself the Declarant, then the Declarant's rights may be conveyed consistent with the CC&R's.

Third, this broader interpretation is consistent with the purposes of the position of Declarant and the role that the person or entity holding that position would play in the successful development of MetroWork. The apparent purpose for initially making India Street the Declarant was to allow it to manage and operate MetroWork during the developmental stages, and to maximize the return on its investment until all of the condominium units were sold to others. It is reasonable that a lender providing financing for the project would want the deed to include the Declarant's rights so that, in the event of a default, the lender would be in a position to protect, and maximize the value of, its collateral pending the further sale of the foreclosed units. Polger, India Street's attorney, acknowledged as much. The lender, a bank, is principally concerned with recouping the loan on which the debtor has defaulted, and may not be in a position to manage a large development on a

day-to-day basis after a default. Accordingly, as happened here, the bank would logically want to sell the collateral as quickly as possible, and for as great a return as possible, perhaps before the development is completed. For these reasons, it is reasonable for the CC&R's to authorize the transfer of the Declarant's powers and rights to an entity other than a direct assignee of India Street, to assure that the Declarant's role is filled for as long as might be necessary to ensure the successful completion of the project.

Having determined that the CC&R's authorize the assignment of the Declarant's rights to entities other than a direct assignee of India Street's, we next address whether PV Little Italy in fact acquired the Declarant's rights, including Class B voting rights, from Oreo, or whether, as the trial court concluded, PV Little Italy could not have acquired Class B voting rights because it was "an unaffiliated owner."

PV Little Italy contends that because the transfer from the trustee to Oreo included all of the Declarant's rights, and Oreo in turn assigned any and all such rights to PV Little Italy, PV Little Italy became the Declarant. In other words, PV Little Italy maintains that the status of Declarant, and all of the Declarant's rights, including Class B voting rights, were simultaneously transferred to Oreo, and then to PV Little Italy, so there was no sale of any unit by the Declarant to an "unaffiliated" third party. India Street does not address PV Little Italy's "simultaneous transfer" theory at all. Rather, it simply parrots the trial court's conclusion that because PV Little Italy is neither affiliated with, nor an express assignee of, India Street, it could not have acquired any Declarant's rights.

PV Little Italy has the better argument. First, we have concluded that the trustee obtained the Declarant's rights upon foreclosure after India Street's default, and that the CC&R's authorize the assignment of the Declarant's rights by the Declarant—whichever entity that might be—to future successors in interest. That is precisely what occurred here, in the successive transfers after the foreclosure. At KeyBank's direction, at the trustee's sale, the trustee conveyed to Oreo "all of its right, title and interest" in the foreclosed units of MetroWork, "[t]ogether with all of the property set forth" in an attachment to the trustee's deed upon sale, which specifically included a description of the Declarant's rights. This conveyance was a "unified sale," meaning it was intended to include "*all* real property and personal property" covered by the security interest created by the Trust Deed. (See Cal. U. Com. Code, § 9604, subd. (a)(1)(B) [authorizing unified sale].) Thereafter, Oreo conveyed to PV Little Italy by grant deed all of its rights in the foreclosed units, and separately but simultaneously assigned to PV Little Italy, all of its Declarant's rights. Consequently, PV Little Italy was not a third party purchaser of the foreclosed units, but rather, an assignee of the Declarant. As such, it acquired rights and property from Oreo *as the Declarant*.

As we have explained, the conveyance by the existing Declarant to another entity of all units owned by the Declarant, together with all of the Declarant's rights, is a transaction that section 7.03 of the CC&R's expressly authorizes. In our view, this is an entirely different type of transaction from that discussed in CC&R's section 2.05, which concerns only the sale of a unit owned by Declarant to an "unaffiliated third party." We must view CC&R's section 2.05 in the context of the entire agreement, and construe the instrument in a manner that gives effect to all of its provisions. (See *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 18 [125 Cal.Rptr.3d 522] [" 'We must view the language of a contract as a whole . . . [and] we should give effect to every provision and avoid rendering any part of an agreement surplus-age.' "].) The term "unaffiliated third party" in CC&R's section 2.05 logically cannot mean "unaffiliated with India Street." Rather, it must mean "unaffili-ated with the Declarant." Otherwise, the power of assignment in CC&R's section 7.03 (and § 1.15 as well, as we have interpreted it here) would be rendered a nullity.

For these reasons, CC&R's section 2.05 does not come into operation when the Declarant is conveying all of the units that it owns to another entity that will itself become the Declarant as a result of the conveyance. If, for example, Oreo had conveyed 12 of the foreclosed units to PV Little Italy, together with the Declarant's rights, but sold the remaining four foreclosed units to some other entity that had no affiliation to Oreo, no Declarant's rights, and no Class B voting rights, would attach to those latter four units. Rather, the new owner of those units would have Class A membership in the Association only, pursuant to CC&R's section 2.05. But PV Little Italy would be the new Declarant, and would possess Class B voting rights, as Declarant, to the 12 units it acquired.

The fatal flaw in India Street's argument is that it attempts to rewrite the CC&R's so that only India Street or its direct assignee can be "Declarant." This is reflected in India Street's brief on appeal, where it states, "The CC&Rs expressly granted Class B membership voting rights *exclusively to India Street* (or its affiliate or direct assignee)." (Italics added.) Section 7.03 of the CC&R's proves that statement to be inaccurate. Similarly, India Street claims that "*India Street's* Class B membership voting . . . rights" would terminate either upon "*India Street's* divestiture of its entire ownership in its units or (2) *India Street's* sale of a unit to an 'unaffiliated third party.' " (Italics added.) However, CC&R's section 2.05 nowhere mentions the words "India Street." Rather, it uses the term "Declarant," and as we have seen, the "Declarant" can be India Street, its direct assignees, or the assignees of its assignees.

Accordingly, when Oreo simultaneously conveyed all of its De-clarant's rights to PV Little Italy, PV Little Italy acquired those rights,

including the Class B voting rights, pursuant to sections 1.15 and 7.03 of the CC&R's. The consequences that arise when a Declarant sells a unit to an unaffiliated third party, as set forth in CC&R's section 2.05, thus never arose on that transaction. For this reason, the trial court's ruling that PV Little Italy acquired no Declarant's rights, and no Class B voting rights as the Declarant, was erroneous.

## IV. CONCLUSION

The order of the trial court is reversed. PV Little Italy shall recover its costs on appeal.

Huffman, Acting P. J., and Haller, J., concurred.