Filed 3/3/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ALEXANDER SOROKUNOV,<br><br>　　　Plaintiff and Appellant,<br>v.<br><br>NETAPP, INC.,<br><br>　　　Defendant and Respondent. | A171964<br><br>(Alameda County Super.<br>Ct. No. RG19037264) |

Plaintiff Alexander Sorokunov sued his former employer NetApp, Inc. (NetApp), alleging various violations of the Labor Code.  He also sought civil penalties and wages pursuant to the Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.) (PAGA).[1]  The trial court granted NetApp's petition to compel arbitration of Sorokunov's individual claims, and following the arbitration, the arbitrator entered an award in NetApp's favor on each of those claims.  The trial court then confirmed the arbitration award.  While the arbitration was still pending, the trial court denied Sorokunov's motion for summary adjudication of his PAGA claim.  After confirmation of the arbitration award, the court granted NetApp's motion for judgment on the pleadings on the PAGA cause of action on the ground that Sorokunov's lack of standing as an aggrieved employee was conclusively determined by the arbitration award.

---

[1] All undesignated statutory references are to the Labor Code.

On appeal, Sorokunov contends the court erred by (1) compelling arbitration of his individual claims; (2) denying his motion for summary adjudication; (3) confirming the arbitration award; and (4) applying the principles of issue preclusion to conclude that he lacked standing to pursue the PAGA claims. We affirm the judgment.

## BACKGROUND

Sorokunov was employed by NetApp from 2016 through June 2019. His compensation consisted of an annual salary and "commissions." His commissions for the relevant time period were governed by two documents: his individual Goal Sheet and the Compensation Plan for fiscal year 2019 (Plan).

Under section 4.2.1.1 of the Plan, "Commissions are based on the achievement of revenue goals ('Goal') as set forth in the Participant's Goal Sheet. Commissions are calculated as a percentage of sales revenue the Participant achieves in his or her Territory during the period defined in the Goal Sheet" and are "earned only when (a) a customer has paid the Company the full contract amount . . . and (b) the Company has made all adjustments for refunds, credits, price changes, cancellations or de-bookings unless otherwise prohibited by applicable law."

Under the windfall provision in section 6.7 of the Plan, NetApp reserved the right to limit an employee's commissions to avoid a windfall. Under that provision, a windfall may occur if an employee's goal for a particular territory is exceeded by more than 200 percent. If NetApp invokes this provision, "a Participant may receive a Goal adjustment or a lower

Commission . . . payment than the amount provided for in the Participant's Goal Sheet."[2]

Sorokonov and about another 300 other salespeople earned commissions for sales in excess of 200 percent of the goals NetApp set for them in fiscal year 2019. In May 2019, NetApp informed Sorokunov and the other employees that NetApp was invoking the windfall provision. He explained by email that "Under the terms of NetApp's [Plan], NetApp may limit commission payments to avoid a windfall to any participant whose goal attainment exceeds 200%. [¶] . . . [Y]our performance in FY19 resulted in a windfall under the terms of the plan. As a result, further commissions above 200% of goal attainment will not be paid." At a subsequent company meeting, NetApp executives explained that the windfall provision was being invoked in the interest of the company and its shareholders to avoid windfalls in commissions where there was widespread attainment over participants' goals due to forecasting errors. As a result, Sorokunov's last check for fiscal year 2019 was $31,402.42 less than it would have been if he had been paid 0.8048 percent on the $3,844,422.46 in April sales.

Sorokunov resigned the next month, and later submitted a PAGA notice to the Labor and Workforce Development Agency (LWDA) and NetApp. In January 2020, after waiting the required time for the LWDA to investigate, Sorokunov filed his First Amended Complaint. As relevant here, the complaint alleges that NetApp's practice of promising commissions but reserving the right not to pay earned commissions violates section 2751, subdivision (a) of the Labor Code (section 2751(a)), which requires NetApp to

---

[2] In his complaint, Sorokunov identified other provisions that he alleged gave "NetApp the right [to] determine commission rates retroactively and not to pay earned commissions." On appeal, his opening brief does not focus on any specific provision other than the windfall provision.

put its offers for commissions in a writing that states the method by which commissions shall be computed and paid.[3] The complaint alleges further that "[w]hen NetApp retroactively reduces earned commissions, declares windfalls and uses the other Plan provisions to deprive employees of earned commissions, NetApp violates [section] 221 of the Labor Code," and that when "NetApp purports to pay commissions according to the Goal Sheets, as required by law and contract, but secretly takes back its promises for commissions in the fine print of its 'confidential' Plan so that employees and others do not know what commissions NetApp shall actually pay," it violates section 223.[4] The complaint alleges that these violations are unlawful, unfair, dishonest, and deceptive practices prohibited by the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.) (UCL), and that NetApp's application of these policies resulted in a breach of contract. Sorokunov also sought PAGA penalties for the violation of sections 2751(a), 221, and 223. Lastly, the complaint alleges an individual claim for violation of section 202, subdivision (a), based on NetApp's failure to pay Sorokunov's earned but unpaid commissions at the time of his resignation.

---

[3] Section 2751(a) reads, "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid."

[4] Section 221 reads, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Section 223 reads, "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

In December 2020, the court granted NetApp's motion to compel arbitration of Sorokunov's individual non-PAGA claims, but denied its request to stay proceedings on the PAGA claims.

In August 2023, while the arbitration was pending, Sorokunov moved for summary adjudication of his PAGA claim that the Plan violated section 2751(a) because it failed to provide "the method by which the commissions shall be computed and paid." In May 2024, the court denied the motion on the grounds that Sorokunov had not presented undisputed evidence that the Plan was subject to section 2751, and alternatively, if section 2751 applied, NetApp had presented evidence that its compensation plan complied with the requirements of the statute sufficient to defeat a motion for summary adjudication.

Thereafter, in July 2024, the arbitrator entered an award finding in NetApp's favor on each of Sorokunov's individual claims. Initially, the arbitrator concluded that NetApp's exercise of the windfall provision did not amount to a breach of contract and that there was no merit to Sorokunov's wage fraud claims. As relevant here, in connection with Sorokunov's claim under the UCL, the arbitrator found that NetApp had not violated Labor Code sections 221, 223, or 2751. The arbitrator explained, "Section 221 provides that '[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages heretofore paid by said employer to said employee.' The key word in the statute is 'paid;' there is no mention of 'earned.' This statute would arguably apply if NetApp had tried to recoup the commissions paid in the February and March checks on the ground that the cap had been exceeded in those two months; it does not apply to whatever the contract defines as 'earned' but unpaid. Of course, the payments in February and March may not have been 'earned' at that time but simply *advances* on

5

what it was projected might be the total earned by the end of the fiscal year. That need not be decided here, though, because there was no attempt to recoup or 'clawback' those payments."

Next, the arbitrator explained, "Section 223 applies to wherever 'any statute or contract requires an employer to maintain the designated wage scale,' an employer cannot secretly pay less while purporting to pay per the scale. Here there is no statute requiring the maintenance of any wage scale; and while there is arguably a 'wage scale' in the contract, the limitation in the Windfall Clause does not result in NetApp 'secretly' paying less. Rather NetApp paid 'advances' per the formula in the Goal Sheet, but those advances were always subject to the possibility of the Windfall Clause being invoked. That was plain on the face of the Plan, and Claimant conceded he had read that in the Plan. . . . In short, there was no 'secrecy' to the possibility of invoking the cap, its actual invocation and its effect on his April check."

Finally, the arbitrator found that section 2751 was not applicable to the commissions governed by the Plan and that alternatively, the requirements of section 2751 were satisfied. With respect to the first ground, the arbitrator explained that " 'commissions' as defined by the statute, . . . requires the employee be paid *primarily* for selling a product or service and the amount be a percentage of the price of the product or service the employee sold. [Citation.] Claimant did not make any sales himself but supported a sales team and his incentive pay was not a percentage of revenue arising from those sales. . . . Claimant's 'commission' was also not a straight percentage of revenue from his sales support but rather was calculated on a formula based on a different levels (sic) of quota attainment and the sales performance of territories in which he provided no support. . . . Accordingly, there is insufficient evidence that the 'commissions' Claimant was paid come within

6

[section] 2751; rather, the evidence is undisputed that his 'commissions' as defined in the contract do not satisfy either element of the statutory definition." As to the second ground, the arbitrator explained, "Claimant argues that the fact that there was and is a discretionary element to NetApp's commission system, there was not a 'method'—that is, a purely mathematical one—that allows commissions to be computed and paid as allegedly required by the statute. . . . Neither the wording of [section 2751] nor its legislative history support the notion that commissions must be susceptible to mechanical calculation without any element of discretion."

In September 2024, the court granted NetApp's petition to confirm the arbitration award. Thereafter, relying on its order confirming the arbitration award, the court granted NetApp's motion for judgment on the pleadings on the PAGA claims.

## DISCUSSION

## I.

Code of Civil Procedure section 1281.2 requires a trial court to grant a petition to compel arbitration "if [the court] determines that an agreement to arbitrate the controversy exists." The party seeking to compel arbitration has the initial burden to plead and prove the existence of a valid arbitration agreement that applies to the dispute by a preponderance of the evidence. Once that burden is satisfied, the party opposing arbitration must prove by a preponderance of the evidence any defense to the agreement's enforcement. (*Ibid.*; see *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59.)

The United States Supreme Court has directed that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state law principles that govern the formation of

7

contracts." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 and 945, citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.* (1985) 473 U.S. 614, 626; see also *Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 418 [arbitration agreements are " 'as enforceable as other contracts, but not more so' "].)  The same is true under California law.  (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 ["an arbitration agreement is governed by contract law and is construed like other contracts to give effect to the intention of the parties"]; *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 640 ["The *existence* of a valid agreement to arbitrate involves general contract principles"]; see also *Fuentes v. Empire Nissan, Inc.* (Feb. 2, 2026, No. S280256) ___Cal.5th___ [2026 Cal. LEXIS 481, at *23, citing *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 579 [" 'the policy " 'favoring' " arbitration is not one of promoting arbitration over litigation, but instead of ensuring that arbitration agreements are not disfavored, i.e., that they are treated like other contracts' "].)

"An order granting a petition to compel arbitration is not appealable, but is reviewable on appeal from a subsequent judgment on the award." (*Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 7–8.)  We review the trial court's order de novo when the decision does not depend on conflicting extrinsic evidence.  (*Id.* at p. 8; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 650.)

NetApp's petition sought to compel arbitration of Sorokunov's individual claims under section 26 of the Plan, which states:  "Subject to a Participant's right to opt out, as provided in Paragraph 26(c) below, External Dispute Resolution shall be available to NetApp or a U.S. Participant as the exclusive means to resolve a Dispute after Internal Dispute Resolution has been attempted and there has been no resolution of the Dispute to NetApp's

8

or the Participant's satisfaction within 90 days after submission to the [Sales Comp Review Board]." Sorokunov's PAGA claim was excluded from NetApp's petition under the "class and collective action waiver," which reads, "Private attorney general representative actions under the California Labor Code are not arbitrable, not within the scope of the arbitration provisions in Paragraph 28(a) and may be maintained in a court of law."

Sorokunov does not dispute that the above provision purports to establish a bilateral obligation to arbitrate his individual claims. He contends, however, that two provisions in the Plan render NetApp's promise to arbitrate illusory because they permit NetApp unilaterally to amend, suspend, or terminate the arbitration provision and apply those changes to any wage claims known but not previously filed for internal dispute resolution with the Sales Comp Review Board.

First, Paragraph 2.6 of the Plan states: "NetApp reserves the right to revise the Plan, and the policies and programs referenced in this Plan, at any time and without advanced notice, to the extent permitted by applicable law."

Second, Paragraph 25 of the Plan states: "The Company reserves the right to amend (including but not limited to adding to, deleting or otherwise modifying), suspend and/or terminate the Plan at any time in its sole discretion, consistent with and to the extent permitted by applicable law, but such action shall not apply to any Dispute in Internal Dispute Resolution or External Dispute Resolution as provided in Paragraphs 17 and 26 herein."

NetApp responds that Sorokunov's argument fails to recognize the fundamental limit on its ability to alter the arbitration agreement imposed by the covenant of good faith and fair dealing implied in every contract.

In general, "[a] contract is unenforceable as illusory when one of the parties has the unfettered or arbitrary right to modify or terminate the

9

agreement or assumes no obligations thereunder." (*Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 385.) However, where the contract gives one party the power to modify or terminate, " ' "it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair dealings." ' " (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1214 (*24 Hour Fitness*) ["discretionary power to modify the terms of the personnel handbook in [written] notice indisputably carries with it the duty to exercise that right fairly and in good faith. [Citation.] So construed, the modification provision does not render the contract illusory"].)

In *Peleg v. Neiman Marcus Group, Inc.* (2012) 204 Cal.App.4th 1425, 1433, 1436 (*Peleg*), the court found the following unilateral modification provision illusory: "This Agreement can be *amended, modified, or revoked in writing by the Company at anytime*, but only upon thirty (30) days' advance notice to the Covered Employee of that amendment, modification, or revocation. However, any amendment, modification, or revocation will have *no effect on any Claim that was filed for arbitration prior to the effective date* of such amendment, modification, or revocation." The court explained that this "modification provision improperly creates two categories of claims: those filed within 30 days of notice—the protected category—and those that have accrued or are known to the employer but are not filed within 30 days— the unprotected category." (*Id*. at p. 1457.) Initially, applying Texas law under the agreement's choice of law provision, the court concluded that the provision was illusory because Texas law requires that both filed claims and those that have accrued or of which the employer has knowledge must be *expressly* excluded from the scope of an employer's unilateral modification provision. (*Ibid*.)

10

The court in *Peleg* then discussed "California law on illusory arbitration contracts to decide whether the law chosen by the parties is in conflict with a fundamental policy of California." (*Id.* at p. 1463.) The court confirmed that, under California law, "[a] unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the [implied] covenant [of good faith and fair dealing] so that changes do not apply to such claims." (*Ibid.*) In such cases, the contracts are not illusory. (*Ibid.*) The court explained, however, that if "a modification provision expressly addresses whether contract changes apply to claims that have accrued or are known to the employer, the covenant cannot create implied terms that contradict the express language. [Citations.] An arbitration agreement that expressly *exempts* all claims, accrued or known, from contract changes is valid and enforceable without resort to the covenant. If, on the other hand, an arbitration agreement expressly applies a contract change to such claims, the covenant cannot vary the plain language, and the agreement is illusory." (*Ibid.*) Ultimately, the court concluded that because "Texas law is more demanding than California law, which, depending on the circumstances, may *imply* such a restriction . . ., it can hardly be said that Texas law is contrary to a fundamental policy of California." (*Id.* at p. 1466.)

Sorokunov argues that the language in the *Peleg* agreement is indistinguishable from the NetApp language and that under California law, as set forth in *Peleg*, the arbitration agreement is illusory. Specifically, he argues that because NetApp's modification provision expressly exempts only filed claims but not known or accrued but not filed claims, NetApp's reliance on the implied covenant conflicts with the plain language of the arbitration agreement. (See *Moua v. Optum Servs., Inc.* (C.D.Cal. 2018) 320 F.Supp.3d 1109, 1114 [Under *Peleg*, modification provision that states that "the only

11

claims exempt from unilateral modification [by the defendant's parent company] are those that have been served on the Corporate Employee Relations Department" renders arbitration agreement illusory and that "because the express terms provide which claims will be exempt from modifications, the covenant of good faith and fair dealing cannot apply to save the Policy from being unenforceable"].)

NetApp disputes that its modification provision is at all similar to that at issue in *Peleg*. It argues that, unlike in *Peleg,* its agreement "does not give NetApp the express right to cancel arbitration as to claims it knows about but which have not been submitted to the dispute resolution process. It merely states that NetApp cannot modify the agreement as to claims already in the dispute resolution process." (Emphasis omitted.) We agree.

Because the agreement in *Peleg* stated that modifications of the agreement would apply to all claims except those already filed, the court could not imply a contrary restriction on the agreement. Here, however, the Agreement provides that modification is allowed *only* if "consistent with and to the extent permitted by applicable law" and then expressly excludes application of any modifications to filed claims. Under *24 Hour Fitness* and *Peleg*, modification of an arbitration provision after a claim is known, even if not yet filed, is precluded by the covenant of good faith and fair dealing. (*24 Hour Fitness, supra,* 66 Cal.App.4th at p. 1214; *Peleg*, *supra*, 204 Cal.App.4th 1465.) Thus, under the agreement before us, NetApp cannot apply any modifications of its agreement to known but unfiled claims because that would be inconsistent with and not permitted by applicable law.[5]

_____

[5] We acknowledge that the use of the word "but" in the modification provision is arguably confusing insofar as it suggests that applying modifications of the agreement to filed claims might otherwise be permitted

12

*Casas v. Carmax Auto Superstores California LLC* (2014) 224 Cal.App.4th 1233 is instructive on this point. In that case, the modification provision provided that " '[a]ll claims arising before alteration or termination shall be subject to the [agreement] in effect at the time the Arbitration Request Form is received by the Company.' " (*Id.* at p. 1237.) The court observed that under *Peleg,* "[t]o the extent that this express statement would subject a claim to a modified agreement where the claim arose before a modification, but was not submitted to arbitration until after incorporation of that modification into the arbitration agreement, the covenant of good faith and fair dealing cannot vary the plain language, and the contract is illusory." (*Casas*, at p. 1237.) The court held that the arbitration agreement was not illusory, however, in light of a second provision, which stated that "if any of the arbitration rules 'is held to be in conflict with a mandatory provision of applicable law, the conflicting Rule or Procedure shall be modified automatically to comply with the mandatory provision' until the rules can be formally modified to comply with the law." (*Ibid.*) The court explained that this express statement "means that should an employee assert a claim that arose before modification of the agreement, CarMax could not apply the modifications to that claim." (*Ibid.*) Because the relevant provision in this case permits a modification by NetApp only that is "consistent with and to the extent permitted by applicable law," it also means that NetApp cannot apply modifications to accrued or known claims that have not been filed.

under applicable law. Sorokunov has not argued, however, this confusion would support denial of the petition to arbitrate. Nor does he suggest that an employee would necessarily conclude from the language of the provision that the applicable law does not include any other restrictions on NetApp's ability to modify the arbitration agreement.

Sorokunov's argument to the contrary is not persuasive. He argues that "the maxim 'the expression of one thing ordinarily implies the exclusion of other things,'" applies here to preclude this court from implying other exemptions "*unless* the evidence shows 'a clear intent to the contrary.'" (See *PV Little Italy, LLC v. MetroWork Condominium Assn.*, (2012) 210 Cal.App.4th 132, 151, citing *White v. Western Title Insurance Co.* (1985) 40 Cal.3d 870, 881, fn. 4. [the familiar maxim, *expressio unius est exclusio alterius* (the inclusion of one thing implies exclusion of others), applies to contract interpretation].) As he points out, prior to 2018, the modification provision read in relevant part as follows: "The Company reserves the right to amend (including but not limited to adding to, deleting or otherwise modifying), suspend and/or terminate the Plan at any time in its sole discretion, consistent with and to the extent permitted by applicable law." Sorokunov acknowledges that because this language made no distinction between protected and unprotected claims, the covenant of good faith and fair dealing would apply and the provision would not be illusory. He argues, however, that by amending the agreement to add only the express exclusion of filed claims, NetApp necessarily intended that no other exceptions applied so that modifications would apply to known but not filed claims.

The trial court rejected this argument by noting that the amendment was "plainly intended to ensure that the Company cannot amend the Plan while an employee's claim is in process." We need not speculate as to NetApp's intent regarding the amendment, however, because the amendment merely set forth a specific exemption to the right to modify and did not eliminate other restrictions imposed under the existing language. (See *PV Little Italy, LLC v. MetroWork Condominium Assn., supra,* 210 Cal.App.4th at p. 152. ["If the plain language of the instrument is

14

unambiguous, a court may not 'read into' the document additional terms in order to conform its meaning to what the court's 'intuition' tells it the parties must have intended. Rather, the court 'is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted.' "].) As discussed above, when read as a whole, the provision precludes application of a modified agreement to known but unfiled claims because such action would be inconsistent with and not permitted by applicable law.[6]

Accordingly, we are not persuaded by Sorokunov's argument that the arbitration agreement was illusory. In light of this conclusion, we do not reach NetApp's alternative argument that if the modification provision is unenforceable, the trial court properly applied the severance provision to render the arbitration agreement enforceable. Nor do we reach Sorokunov's argument that, in the interests of justice, we should decline to apply the implied covenant to save an arbitration agreement that "reeks of bad faith and unfairness." Although Sorokunov argued in the trial court that other terms of the arbitration agreement rendered it unconscionable, he has not reasserted those arguments on appeal.

---

[6] Sorokunov suggests that the following "purposes" of the amendment are "immediately evident: First, the CEO and other top executives intended to make retroactive changes to NetApp's wage contracts 'with the benefit of hindsight.' Second, whenever NetApp wants to avoid its promises to pay commissions or arbitrate, NetApp could argue its commissions or arbitration promises are illusory under *Peleg*." We note briefly that neither explanation for the amendment is particularly persuasive. Sorokunov does not explain how the provision excluding filed claims from arbitration impacts NetApp's ability to modify wages retroactively. Nor has Sorokunov cited any authority suggesting that a party could avoid a contractual obligation by arguing that its *own* promise was illusory.

15

**II.**

Sorokunov contends the trial court erred in denying his motion for summary adjudication. Under Code of Civil Procedure section 437c, subdivision (f)(1), a plaintiff "may move for summary adjudication as to one or more causes of action within an action" if the plaintiff contends that there is no defense to the cause of action. "[T]he plaintiff meets 'his or her burden of showing that there is no defense to a cause of action' if the plaintiff 'prove[s] each element of the cause of action entitling the party to judgment on the cause of action.' " (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 80; Code Civ. Proc., § 437c, subd. (p)(1).) A motion for " 'summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' " (*Campbell v. FPI Management, Inc.* (2024) 98 Cal.App.5th 1151, 1162.)

"We review a ruling on summary judgment or summary adjudication de novo and 'decide independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law.' [Citation.] In so doing, we liberally construe the evidence in favor of the party opposing the motion and resolve all doubts concerning the evidence in their favor." (*Campbell v. FPI Management, Inc.*, *supra*, 98 Cal.App.5th at p. 1161.)

Sorokunov's first cause of action alleged that the Plan violates section 2751(a) by failing to set forth the method by which the commissions shall be computed and paid. This claim was submitted to arbitration. His fourth cause of action seeks PAGA penalties for the violation of section 2751(a), alleged in the first cause of action.

16

In his motion for summary adjudication, Sorokunov sought a determination of whether the Plan complied with section 2751(a). He argued that the motion presented only the following legal question: Does section 2751 permit "employers to both (1) offer to pay commissions in amounts ascertained by specific mathematical calculations and (2) reserve discretion to: (a) make *retroactive* changes to the method of computing commissions, (b) take deductions from ('adjust') the amounts it counts as 'commissionable revenue,' and (c) take deductions from ('adjust') the amounts computed under the mathematical formulas in its written commission contracts." In ruling on the motion, the court clearly delineated, however, what was not at issue in the motion: "The issue of whether the commission contracts permit NetApp to take discretionary deductions from earned wages concerns whether NetApp violated Labor Code 221–224. That is not at issue in this motion. This motion is about whether the undisputed facts show that NetApp violated Labor Code [section] 2751(a)." On appeal, Sorokunov does not challenge this element of the court's ruling.

With respect to section 2751(a), the trial court first rejected Sorokunov's argument that the statute requires that the contract set forth a "purely mechanical method" for calculating commissions. Instead, the court interpreted the statute to require a written contract that covers how commissions are calculated and paid sufficient to meet the general requirements for enforceable contracts. The court then denied the motion, finding that Sorokunov had "not presented undisputed evidence that the commission contracts were subject to Labor Code [section] 2751(a)" and that he had "not presented undisputed evidence that the commission contracts were in violation of Labor Code [section] 2751(a)." With respect to the second ground, the court added, "Defendant has presented evidence suggesting that

17

the commission contracts included 'the method by which the commissions shall be computed and paid.'  Taking all factual inferences in favor of Defendant, a trier of fact could find that the commission contracts meet the general contractual requirements for enforceable contracts."

On appeal, Sorokunov contends that, because there is no dispute over the terms of the Plan, his motion raised only a question of statutory interpretation—whether section 2751(a) required that the Plan set out a purely mathematical method by which commissions were to be calculated and paid.  His argument, however, ignores the alternative basis of the court's decision—that triable issues of fact exist as to whether the Plan was subject to the requirements of section 2751(a).

In opposition to the motion in the trial court, NetApp argued, "Plaintiff seeks a summary adjudication ruling, on a PAGA-wide basis, that NetApp did not provide allegedly aggrieved employees with compensation plans that comply with Section 2751.  Section 2751 applies only to contracts involving 'commissions,' as that term is defined in Labor Code Section 204.1: 'compensation paid to any person for services rendered *in the sale* of such employer's property or services and *based proportionately upon the amount or value thereof*.'  (Lab. Code § 204.1 (emphasis added).)  However, this is not a class action, and so there is no defined certified class.  Plaintiff has presented no facts in his separate statement that lay a foundation that even one NetApp employee was subject to Section 2751—as discussed below, not even as to himself.  Instead, Plaintiff assumes that the compensation of every California employee who participated in NetApp's incentive compensation plan ('Participants') qualifies as a 'commission' agreement governed by Labor Code Section 2751.  It was Plaintiff's burden to present specific facts that employees were governed by Section 2751 and experienced violations, and he

18

did not because he cannot. [¶] Plaintiff admits that he was an engineer, 'not a salesperson.' . . . His compensation target was 75% salary, and only 25% was connected in any way to sales activity. Even that 25% was based on a complex formula with different percentages applied at different levels of quota attainment by both his sales team and *other sales teams he did not support*."

In his reply in the trial court, Sorokunov insisted that, as a factual matter, the evidence showed that he was involved in sales, but argued that "the Court need not decide whether Mr. Sorokunov or any other employee was primarily involved in sales" because section 2751 defines "commissions" to include both commissions as defined by Labor Code section 204.1 and, under section 2751, subdivision (c), as any " 'offer by the employer to pay a fixed percentage of sales or profits as compensation *for work to be performed'* " and "NetApp admits it offers commissions to Plan Participants who work in California."

The court apparently agreed with NetApp when it ruled that "Plaintiff has not presented undisputed evidence that the commission contracts were subject to Labor Code [section] 2751(a)."

In his opening brief, Sorokunov made no attempt to show that the court erred in finding that triable issues of fact existed as to whether "commissions" earned by Sorokunov or any other employee under the Plan fell within the scope of section 2751. To the contrary, despite this issue having been argued in the trial court and relied on by the trial court, Sorokunov focuses his entire argument on appeal on the proper interpretation of section 2751(a)—i.e., whether it requires a purely

19

mathematical method for determining the commission to be paid.[7]  While he finally reaches the issue in his reply brief, Sorokunov cannot rely on this belated argument to meet his appellate burden.  (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232.)

On appeal, including an appeal from a summary adjudication, the appellant has the burden of demonstrating prejudicial error.  (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1140.)  Even if the trial court had misinterpreted section 2751(a), it would not necessarily follow that it erred in denying Sorokunov's motion because the alternative ground remains unchallenged.  (See *Campbell v. FPI Management, Inc.*, *supra*, 98 Cal.App.5th 1151, 1173.)  The trial court's denial of Sorokunov's motion for summary adjudication could be affirmed solely on this basis.  Nonetheless, given the relevance of the issue to the remaining arguments asserted on appeal, we address Sorokunov's argument that the trial court misinterpreted section 2751(a).

Sorokunov contends that under section 2751(a), NetApp was required to set forth in its Plan a *mathematical* method by which commissions would be computed and was required to pay those commissions as calculated.  Sorokunov does not dispute that the initial calculation of commissions under the Plan complies with section 2751.  He contends, however, that the inclusion of the windfall provision in the Plan, which allows NetApp to limit an employee's commissions under certain circumstances, violates

---

[7] As set forth above, the arbitrator also found merit in NetApp's argument when it found that there was "insufficient evidence that the 'commissions' Claimant was paid come within [section] 2751; rather, the evidence is undisputed that his 'commissions' as defined in the contract do not satisfy either element of the statutory definition."  As with his argument addressing the denial of his motion for summary adjudication, Sorokunv also does not address this element of the arbitrator's award in his opening brief.

section 2751 by permitting "a *discretionary* process for determining the commissions due." He argues that, given the substantial protections for wages under the Labor Code, the commissions must be paid in full under the mathematical formula set forth in the Plan and that NetApp cannot include in the Plan a provision that allows it to apply discretionary limits on the amounts paid.

Section 2751 was enacted, in part, to address "the wage risk inherent in all commission-based employment" that arises when commissions are "promised orally as an inducement to the employee" but "are unenforceable due to the opaqueness of the commission structure." (*Lett v. Paymentech, Inc.* (N.D.Cal. 1999) 81 F.Supp.2d 992, 994.) Accordingly, section 2751 seeks to protect employees by requiring "a written contract explaining the commission structure at the time of employment." (*Ibid*.) NetApp's Plan, as the trial court concluded, meets this standard. It explains the commission structure— the method of computing and paying commissions—at the time of employment. It also sets forth the circumstances under which modification of the initial calculation might occur.[8] An employee earning commissions under

___

[8] The windfall provision in section 6.7 of the Plan reads in full as follows: "The Company reserves the right to limit a Participant's Commission . . . payments to avoid a Windfall. Nonexclusive examples of a Windfall include, but are not limited to: [¶] [] a Participant's payment far exceeds the Participant's contributions towards the Goals, . . . or [¶] [] a deal that contributes greater than 50% of a Participant's annual Sales Goal; or [¶] [] a Participant's Goal attainment exceeds 200%. [¶] Where these or related scenarios occur, the Sales Leader, or his or her designee, will review the Participant's attainment to determine whether a Windfall has occurred. If a Windfall occurs, the Company reserves the right to limit a Participant's Commission . . . payment based on a Sales Leader's, or his or her designee's, evaluation of the situation, to the extent permitted by applicable law. In the case of a Windfall, a Participant may receive a Goal adjustment or a lower

the Plan would be in a position to both understand the method by which commissions were earned and seek relief should NetApp violate the agreement. The Plan complies with the requirement of section 2751, subdivision (a) that a written contract set forth the "method by which the commissions shall be computed and paid."

Had the Legislature intended to impose specific restrictions on the methods by which commissions could be calculated, it could have done so. Section 2751, however, provides a different type of protection: It requires that the method be set forth in writing.

Contrary to Sorokunov's argument, the trial court's interpretation of section 2751 does not deny employees the protection for wages afforded them in the Labor Code. There is no dispute that commissions are wages and thus that they are subject to the various protections afforded employees under the Labor Code. (See § 200 [" 'wages' includes all amounts for labor performed"]; § 221 [it is unlawful "for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee"]; § 223 [it is unlawful to "secretly pay a lower wage while purporting to pay the wage designated by statute or by contract"].) As the trial court ruled, however, whether those protections were violated by NetApp was not at issue in Sorokunov's motion for summary adjudication. Accordingly, Sorokunov has not persuaded us that the trial court erred in denying his motion for summary adjudication.[9]

---

Commission . . . payment than the amount provided for in the Participant's Goal Sheet."

[9] In light of this conclusion, we do not reach NetApp's alternative argument that Sorokunov's challenge to the denial of his motion is moot.

22

## III.

Under Code of Civil Procedure section 1285.4, a petition to confirm an arbitrator's award "need only set forth (1) the names of the arbitrators, (2) the arbitration agreement (by description or attached copy), and (3) the award and written opinion of the arbitrators (by description or attached copy)." (*Eternity Investments, Inc. v. Brown* (2007) 151 Cal.App.4th 739, 745.) "If a petition . . . is duly served and filed, the court shall confirm the award as made, unless in accordance with this chapter it corrects the award and confirms it as corrected, vacates the award or dismisses the proceedings." (Code Civ. Proc., § 1286.) Accordingly, once a petition to confirm that meets the statutory requirements has been served, " 'the burden is on the party attacking the award to affirmatively establish the existence of error.' " (*Rivera v. Shivers* (2020) 54 Cal.App.5th 82, 94.)

Under the California Arbitration Act (Code Civ. Proc., § 1280 et seq.), the court can vacate an arbitration award if "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc. § 1286.2, subd. (a)(4); see also 9 U.S.C. § 10(a) [award may be vacated "where the arbitrators exceeded their powers"].) "Arbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error, for ' "[t]he arbitrator's resolution of these issues is what the parties bargained for in the arbitration agreement." ' " (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1184.) This is so "even when . . . errors [of fact or law] appear on the face of the award or cause substantial injustice to the parties." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916 (*Richey*); see also *Moshonov v.*

*Walsh* (2000) 22 Cal.4th 771, 775 [it is settled that arbitrators do not exceed their powers "merely by rendering an erroneous decision on a legal or factual issue, so long as the issue was within the scope of the controversy submitted to the arbitrators"].) Rather, "the excess-of-authority exception applies, and an arbitral award must be vacated, when a court determines that the arbitration has been undertaken to enforce a contract that is 'illegal and against the public policy of the state.' " (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 73; *Richey, supra*, 60 Cal.4th at p. 916 ["Arbitrators may exceed their powers by issuing an award that violates a party's unwaivable statutory rights or that contravenes an explicit legislative expression of public policy"].)

We review de novo a trial court order confirming an arbitration award, including its determination whether the arbitrator exceeded his powers in granting relief. (*Valencia v. Mendoza* (2024) 103 Cal.App.5th 427, 442.) "[E]valuating a challenge to an arbitration award is a two-step process—first the court must determine whether the award is reviewable, and only if review is appropriate does the court consider whether the award should be upheld." (*SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 622.)

Here, Sorokunov contends the trial court erred in refusing to vacate the arbitration award on the ground that the award enforced illegal contract provisions against the public policy of the State of California. He argues: "When the Legislature gave employees the right to wages free from deductions taken for the employer's benefit (§§ 221–224), declared that right unwaivable (§ 219), made it a crime to violate that right (§ 225), prohibited the use or enforcement of contracts purporting to give employers the right to violate that right (§ 2751), and imposed penalties for violating that right (§§ 225.5, 2699, subd. (f)), the Legislature made it clear that employees'

24

rights to wages free of employer deductions is a fundamental right and that courts must not enforce contracts violating those rights."

We agree with Sorokunov that, insofar as he claimed that the arbitral award violated his unwaivable rights under sections 2751, 221, and 223, the trial court should have determined whether the arbitrator committed clear legal error. (*Richey, supra*, 60 Cal.4th at p. 918; see, e.g., *Honchariw v. FJM Private Mortgage Fund, LLC* (2022) 83 Cal.App.5th 893, 899–901; *Brown v. TGS Management Co., LLC* (2020) 57 Cal.App.5th 303, 314, 316; *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 37–38.) Acceding to Sorokunov's request that we decide in this appeal whether "the arbitrator enforced unlawful contract terms to deprive plaintiff of his unwaivable statutory rights," we conclude that the answer is no.

In its summary adjudication ruling, the trial court considered and rejected Sorokunov's argument that the windfall provision violated section 2751(a), and in our discussion above, we found no error in the trial court's conclusion. Accordingly, no further discussion of that statute is required.

With respect to section 221, the arbitrator found that NetApp had not attempted to "collect or receive" from Sorokunov "any part of wages heretofore paid" to him by NetApp in violation of section 221. As noted above, the arbitrator concluded that the word "paid" in section 221 means simply what it says, rejecting Sorkunov's argument that, because he claimed to have already "earned" the commissions that NetApp declined to pay him by invoking the windfall provision, NetApp was "collect[ing] or receiv[ing]" from him amounts that it had already "paid" him. With respect to section 223, the arbitrator found that, given the inclusion of the windfall

25

provision in the Plan, NetApp did not "secretly" pay Sorokunov less than promised under a contractual wage scale.

Sorokunov does not develop a meaningful argument that the arbitrator clearly erred in finding no violation of these provisions. He cites *Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 228, for the proposition that it is prohibited for employers to take deductions from amounts the employer "*has offered or promised to pay* . . . as compensation for that employee's labor." But he fails to address the subsequent holding in that case that "[t]he wage-protection statutes and rules do not . . . forbid a system in which, even though services have already been performed, the final amount of wages cannot be determined until after specified contingencies have come to pass." (*Id.* at p. 239.) As the court explained, "numerous California cases have held that, where the parties so understand and agree, final compensation, or at least a portion thereof, may be contingent on events that occur after the employee has performed service, and even where he or she has already received advance sums. In such circumstances, the employer may set off, against future payments, any excess amounts previously paid. Such a system does not violate section 221's prohibition on the employer's recapture of wages already earned or paid." (*Ibid*; see *DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 808–809 [commissions are earned only when conditions of contract have been satisfied]; *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696, 705–706 [employer that makes advances on commissions to employees may later reconcile any overpayments by deductions from future commissions].) Here, the parties' agreement included the windfall provision, which we concluded above was lawful. We disagree that NetApp's invocation of the provision caused it to collect or receive wages from Sorokunov in violation of

26

section 221 or to secretly pay him less than it agreed to in violation of section 223.  Accordingly, we find no basis to reverse the trial court's confirmation of the arbitration award.

**IV.**

" ' " 'A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' " ' [Citation.]  . . . 'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law; judicially noticeable matters may be considered.'  [Citation.]  Judgment is properly 'granted when the pleadings fail to state facts sufficient to constitute a cause of action.' " (*Rodriguez v. Lawrence Equipment, Inc.* (2024) 106 Cal.App.5th 645, 654–655 (*Rodriguez*).)

Here, applying the general principles of issue preclusion, the trial court concluded that the arbitrator's award, which finally determined that the individual Labor Code violations alleged by Sorokunov had not occurred, conclusively established that he was not an aggrieved employee with standing to prosecute a PAGA claim based on the same alleged Labor Code violations.  On this ground, the court granted NetApp's motion for judgment on the pleadings.  We review the trial court's order de novo.  (*Rodriguez, supra,* 106 Cal.App.5th at p. 654.)

"Issue preclusion 'precludes relitigation of issues argued and decided in prior proceedings.' [Citations.] The doctrine is applied 'only if several threshold requirements are fulfilled,' namely:  (1) 'the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding'; (2) 'this issue must have been actually litigated in the former proceeding'; (3) 'it must have been necessarily decided in the former proceeding'; (4) 'the decision in the former proceeding must be final and on

27

the merits'; and (5) 'the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*Rocha v. U-Haul Co. of California* (2023) 88 Cal.App.5th 65, 78 (*Rocha*).)

PAGA defines an "aggrieved employee" who has standing to bring a PAGA claim as "any person who was employed by the alleged violator [of the Labor Code] against whom one or more of the alleged violations was committed." (§ 2699, subd. (c).) "[U]nless and until there is a finding on the merits regarding the alleged violation, allegations of a Labor Code violation by an alleged employee or former employee are alone sufficient to establish PAGA standing." (*Rocha, supra,* 88 Cal.App.5th at p. 77; see *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1076 ["the statute plainly requires that the plaintiff have 'sustain[ed] a Labor Code violation committed by his or her employer' "].)

In *Gavriiloglou v. Prime Healthcare Management, Inc.* (2022) 83 Cal.App.5th 595, 600, 603 (*Gavriiloglou*), the court held that an arbitration award concluding "that the alleged Labor Code violations did not occur" against the plaintiff did not preclude that same plaintiff from qualifying as an "aggrieved employee" under PAGA based on the same alleged Labor Code violations because the plaintiff was acting in different capacities in bringing her individual claim and her PAGA claim, and she was "not litigating the same right." The court reasoned that in the arbitration, Gavriiloglou was litigating her own individual right to damages for Labor Code violations, whereas in the PAGA action she was litigating the state's right to statutory penalties for Labor Code violations. (*Id.* at p. 603.) The court concluded that she was not litigating the same right because " '[Individual] employees do not own a personal claim for PAGA civil

28

penalties [citation], and whatever personal claims [individual] employees might have for relief are not at stake.'" (*Ibid.*)

In *Rocha, supra*, 88 Cal.App.5th at pages 73, 76, and 79, the court disagreed with the approach taken in *Gavriiloglou* and concluded that an arbitrator's adjudication of a Labor Code violation in favor of an employer in the context of two employees' personal claims for damages precluded those employees from alleging that they had standing under PAGA to seek civil penalties based on the same purported violation. The court explained that the issue of whether the plaintiffs are "aggrieved employees" based on the alleged section Labor Code violation was "actually litigated in the arbitration, and was necessary to resolution of the claims in arbitration." (*Rocha, supra*, 88 Cal.App.5th at p. 79.) The arbitrator's finding was final and binding on the employees, who were parties to the arbitration. (*Ibid.*) The court concluded that "determining whether a plaintiff suffered a Labor Code violation is no different in the context of an individual Labor Code claim [for damages] than it is in the context of determining an employee's standing to bring a PAGA claim. Therefore, in these two scenarios, the plaintiff ' "is in fact litigating the same right." ' " (*Id.* at p. 82.) The court reasoned that this "approach is necessary in order to avoid inconsistent adjudications as to whether a particular Labor Code violation occurred." (*Id.* at p. 78.)

After these cases were decided, in *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1124, the California Supreme Court cited *Rocha* in support of the proposition asserted by the employee that "[i]f the arbitrator determines that Adolph is not an aggrieved employee and the court confirms that determination and reduces it to a final judgment, the court would give effect to that finding, and Adolph could no longer prosecute his non-individual claims due to lack of standing." Then, in *Stone v. Alameda Health*

29

*System, supra*, 16 Cal.5th 1040, 1076–1077, the Court cited *Adolph* and *Rocha* in support of the proposition that "[w]hen liability for [an] underlying violation has not been established, any PAGA claims seeking penalties for the alleged violation must also fail."

Next, in *Rodriguez, supra,* 106 Cal.App.5th at pages 656 to 665, a case procedurally identical to this case, the court relied on *Adolph* and *Rocha* in holding that an arbitrator's previous adjudication of Labor Code violations in favor of the defendant employer precluded plaintiff from asserting a PAGA cause of action based on those same Labor Code violations. The court reasoned that, insofar as the *Gavriiloglou* court conflated the requirements for issue preclusion and those of claim preclusion, only the latter of which requires that the capacity of the plaintiff be the same, it is distinguishable. (*Rodriguez, supra,* 106 Cal.App.5th at p. 657.)

Finally, in *Prime Healthcare Management, Inc. v. Superior Court* (2025) 117 Cal.App.5th 127 (*Prime Healthcare*), the court confirmed its prior determination that the arbitration award in defendant's favor did not bar Gavriiloglou's PAGA claim. The court reiterated its prior reasoning, but citing *Contreras v. Superior Court* (2021) 61 Cal.App.5th 461, 474, also held that "the preliminary or 'gateway' issue of the employee's standing as an 'aggrieved employee' " must be decided by the court rather than by an arbitrator. (*Prime Healthcare, supra,* at p. 141.) The court further reasoned that, to the extent the arbitrator in that case had rejected Gavriiloglou's alleged individual Labor Code claims on the ground that she was an "exempt employee," there was "no finding on the question of whether Gavriiloglou qualifies as an *aggrieved* employee." (*Id.* at p. 139.) The court continued, "It follows that where the arbitrator was not tasked with deciding whether the employee was aggrieved or not, and made no express finding on that issue,

the arbitrator's findings are not binding on the judicial determination of the PAGA claims." (*Id.* at p. 141.)

Relying on *Gavriiloglou*, Sorokunov contends that *Rocha* is factually distinguishable, *Rodriguez* was wrongly decided, and the statement quoted above from *Adolph* is not controlling. He argues that the court erred in giving preclusive effect to the arbitrator's award to bar the PAGA case from proceeding because the parties were not the same or in privity in the arbitration and PAGA case, and because the issues in the PAGA case are not identical to those decided by the arbitrator. He also argues that considerations of policy make application of issue preclusion inappropriate in this case.

As discussed below, we believe that *Rodriguez* properly resolved the disagreement between *Gavriiloglou* and *Rocha* in favor of the application of issue preclusion under these circumstances.

### A.

" ' "In accordance with due process, [issue preclusion] can be asserted only against a party to the first lawsuit, or one in privity with a party." ' [Citation.] 'The bar is asserted against a party who had a full and fair opportunity to litigate the issue in the first case but lost.' " (*Rodriguez, supra,* 106 Cal.App.5th at p. 662.)

Here, the trial court found that Sorokunov, as the plaintiff in both the arbitration and the trial court proceedings, had a full and fair opportunity to litigate his individual Labor Code claims. The trial court found that his "inability to prove his individual Labor Code claims means that plaintiff can no longer allege any individual Labor Code claims with plausible merit" and thereafter he is not an aggrieved employee as defined by the PAGA and does not have standing to prosecute a claim on behalf of the LWDA. In so holding,

31

the court rejected Sorokunov's argument that "dismissal of this case would be an injustice because the arbitrator's decision was in error and there is a public interest in enforcing the state's Labor Code." The court explained, "This order holds only that this particular plaintiff lacks standing under Labor Code [section] 2699, [subdivision] (a) to prosecute the claims that this plaintiff had asserted in this case as proxy and agent of the LWDA under the PAGA. This order does not prevent the LWDA from prosecuting its own action regarding the same alleged Labor Code violations. This order does not prevent any other NetApp employees from asserting individual claims against NetApp in arbitration or in court, or from seeking to assert claims against NetApp as proxy or agent of the LWDA under the PAGA."

Sorokunov contends the trial court erred by concluding that his standing to prosecute a PAGA claim was an issue separate from the merits of the PAGA claim. He argues that "standing cannot be pulled from a PAGA claim and treated as if the LWDA is not involved." He suggests that "[w]henever there is 'no standing' because there were no Labor Code violations, there is also a judgment against the LWDA. Whenever a judgment finds an employee 'has standing' because he suffered a Labor Code violation, there is also a judgment for the LWDA. [¶] The court cannot apply issue preclusion to defeat plaintiff's standing without also applying it against the LWDA, who . . . may be bound by any judgment in a PAGA case through issue preclusion." (Italics omitted.) He also notes that, as practical matter, because the LWDA can bring claims going back only one year (Code Civ. Proc., § 340, subd. (b)), "[e]ven if the LWDA filed a suit against NetApp the same day the superior court entered its judgment on the pleadings, the judgment would extinguish all the LWDA's claims for NetApp's violations of the Labor Code from September 30, 2018 through October 7, 2023."

32

Sorokunov cites only *Arias v. Superior Court* (2009) 46 Cal.4th 969 in support of his argument that the LWDA would be bound by the judgment against Sorokunov. In that case, the Court held that a plaintiff bringing a PAGA claim was not required to meet the requirements for a class action because the action did not raise the same due process concerns. (*Id.* at p. 985.) The court explained that "[b]ecause an aggrieved employee's action under the Labor Code Private Attorneys General Act of 2004 functions as a substitute for an action brought by the government itself, a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." (*Arias*, at p. 986.)

*Arias* does not suggest in any way that a PAGA action that is dismissed on the pleadings due to the plaintiff's lack of standing, rather than decided on the merits of the underlying Labor Code violations, would be binding on the LWDA. To the contrary, as the trial court acknowledged, the adjudication of Sorokunov's individual Labor Code claims has no claim preclusive or issue preclusive effect against the LWDA. (*Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 487–489.) Finally, Sorokunov's argument regarding the practical realities of PAGA litigation is better addressed in connection with his policy argument, which we consider below. It does not establish that NetApp cannot meet the same-party requirement for application of issue preclusion.

## B.

" ' " 'The "identical issue" requirement addresses whether "identical factual allegations" are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same. [Citation.]' " ' [Citation.] 'An issue decided in a prior proceeding establishes [issue preclusion] even if some

factual matters or legal theories that could have been presented with respect to that issue were not presented.' " (*Rodriguez, supra*, 106 Cal.App.5th at p. 659.) " ' "An issue is actually litigated [for purposes of issue preclusion] '[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined . . . .*' " ' [Citation.] 'Courts have understood the " 'necessarily decided' " prong to "require[ ] only that the issue not have been 'entirely unnecessary' to the judgment in the initial proceeding." ' " (*Id.* at p. 660.)

Whether Sorokunov is an "aggrieved employee" for the purposes of PAGA standing is based on his ability to allege that he suffered a Labor Code violation. As explained in *Rocha* and *Rodriguez,* to the extent his PAGA standing is dependent on his having suffered the same Labor Code violations that have been adjudicated in arbitration, his standing and the underlying violations are considered identical issues.

In its order granting judgment on the pleadings, the court rejected Sorokunov's argument that he had not submitted all of his Labor Code claims to arbitration and that he therefore had individual Labor Code claims with plausible merit that would support standing as an aggrieved employee for purposes of his PAGA claim. Sorokunov reasserts this argument on appeal. He contends that "[t]he arbitrator's award was strictly confined to whether NetApp violated the Labor Code based on its $31,402.42 deduction from plaintiff under the Windfalls provision. [¶] The PAGA complaint, in contrast, alleges NetApp violated sections 221, 223, and 2751 in ways other than the 'windfall' deduction: (1) making retroactive changes to contracts to reduce wages on past sales, (2) making discretionary reductions to the sales revenue amounts used to compute wages, and (3) taking discretionary deductions from wages using provisions other than the Windfalls provision.

34

[¶] The arbitrator never addresses whether NetApp violated sections 221, 223, or 2751 in any of these ways." (Footnote omitted.)

NetApp disagrees, asserting that "the same alleged Labor Code violations—Sections 202, 203, 221, 223, and 2751—were at issue in the arbitration that are at issue in the PAGA action; [] the parties actually litigated whether Plaintiff suffered any of those alleged Labor Code violations; [] [and the arbitrator] found that Plaintiff did not suffer any of the alleged Labor Code violations." NetApp is correct. Sorokunov included each of these arguments in its arbitration demand and the arbitrator's award addresses each statute in connection with his UCL claim. Unlike in *Prime Healthcare*, Sorokunov does not argue that, despite the arbitrator's rejection of his alleged Labor Code violations, he nonetheless qualifies as an aggrieved employee under PAGA. (See *Prime Healthcare, supra*, 117 Cal.App.5th at p. 148 [noting that PAGA's definition of an "aggrieved employee" does not "incorporate by reference any other statutes governing exempt or nonexempt employees under other portions of the Labor Code"].)

In his reply, Sorokunov agues that, even if the arbitrator determined that he had not suffered any of the alleged Labor Code violations, the arbitrator's decision reflects legal conclusions, not factual findings subject to issue preclusion. We disagree. The arbitrator determined both as a matter of fact and law that Sorokunov had not suffered any of the alleged Labor Code violations and, as discussed above, we agree with that conclusion. The trial court did not err in finding that the arbitrator's findings were subject to issue preclusion. Nor did the trial court err by relying on those conclusive findings to determine that Sorokunov was not an aggrieved employee or to grant NetApp's motion for judgment on the pleadings on the ground that he lacked standing.

35

## C.

As Sorokunov asserts, even when the threshold requirements of issue preclusion are satisfied, "courts may not apply issue preclusion if considerations of policy or fairness outweigh the doctrine's purpose in a particular case. [Citation.] ' "In deciding whether the doctrine is applicable in a particular situation a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." ' " (*Bullock v. City of Antioch* (2022) 78 Cal.App.5th 407, 416.)

Sorokunov argues: "The PAGA claim is that NetApp uses a Plan that violates a statute of frauds (§ 2751) to systematically take millions of dollars in deductions from employees' earned commission wages in violation of sections 221 and 223—both crimes (§ 225). [¶] To affirm the superior court, this Court would have to hold that courts must give preclusive effect to the statutory interpretations of arbitrators about whether employers have committed crimes against employees. This Court would also have to hold that courts must confirm such arbitration awards and enter judgment *dismissing the State's case* against employers for their crimes against hundreds or even thousands of other employees. All based upon one employee's individual arbitration and without examining the arbitrator's interpretation of the statutes."

As discussed above, the court's order granting judgment on the pleadings does not have any binding or preclusive effect on the state's ability to assert those same claims in a different action. Sorokunov argues that this is not true as a practical matter because, by the time a PAGA suit is dismissed, these claims may be time barred. Under PAGA, however, "[a]s a condition of suit, an aggrieved employee acting on behalf of the state and

36

other current or former employees must provide notice to the employer and the responsible state agency 'of the specific provisions of [the Labor Code] alleged to have been violated, including the facts and theories to support the alleged violation.' " (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545.) The "evident purpose" of this notice requirement is to afford the LWDA the opportunity to decide whether to allocate resources to an investigation of the violations alleged and to allow the employer to submit a response to the LWDA. (*Id.* at pp. 545–546.) Only if the agency elects not to investigate, or investigates without issuing a citation, may the employee bring a PAGA action. (*Id.* at p. 545.) Accordingly, the state is not without the ability to protect its interests when it determines such course of action is appropriate.

## DISPOSITION

The judgment is affirmed. NetApp is entitled to recover its costs on appeal.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
MOORMAN, J. *

---

*Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Alameda Count Superior Court |
| Trial Judge: | Honorable Noël Wise |
| Counsel for Plaintiff and Appellant: | Law Office Of Francis J. Flynn, Jr., Francis J. Flynn, Jr.; Hoffman + Shapleigh Law, Christopher J. Hoffman |
| Counsel for Defendant and Respondent: | Sheppard, Mullin, Richter & Hampton, Thomas Roy Kaufman, Paul S. Cowie, Patricia M. Jeng, Gal Gressel |